LUCILLE MARLOW, Incompetent, etc. et al.
*v.* MICHELE CERINO et al.

[No. 270, September Term, 1973.]

*Decided January 4, 1974.*

620

The cause was argued before MORTON, MOYLAN and GILBERT, JJ.

*Jerome J. Seidenman* and *Martin H. Freeman* for appellants.

*David L. Bowers,* with whom were *Miles & Stockbridge* on the brief, for appellee Michele Cerino. *John F. King,* with whom were *Anderson, Coe & King* on the brief, for appellee Cenap S. Dorkan. *Wilbur D. Preston,* with whom were *Benjamin F. Davis* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee South Baltimore General Hospital.

GILBERT, J., delivered the opinion of the Court.

Lucille Marlow, (Mrs. Marlow), one of the appellants, is a tragic person. She is currently a patient in the Baltimore City Hospital because she is cortically blind and totally and permanently incompetent. Through her guardian Mrs. Marlow filed a suit against Dr. Cenap S. Dorkan (Dr. Dorkan), Dr. Michele Cerino (Dr. Cerino) and South Baltimore General Hospital (S.B.G.H.) in which she alleged that her current condition is a direct result of the negligence of Dr. Dorkan, Dr. Cerino and S.B.G.H. individually or any

combination thereof. Mrs. Marlow's husband joined in the suit in order to recover for the medical expenses incurred in behalf of his wife[1] and for damages to the marital relationship. The matter was removed from the Superior Court of Baltimore City to the Circuit Court for Montgomery County. There, a jury presided over by Judge Ralph G. Shure rendered a verdict in favor of all of the defendants-appellees.

Displeased with the jury's verdict the plaintiffs-appellants have presented for our review a multitude of alleged errors committed by the trial judge. Some of the appellants' contentions are concerned with the jury instructions. Others deal with the trial judge's rulings on the evidence.

## THE FACTS

Mrs. Marlow was admitted to the North Arundel Hospital in Anne Arundel County, Maryland, on the afternoon of January 8, 1969. At that time she was seen in the emergency room by Dr. Dorkan. Dr. Dorkan diagnosed her condition as "pleural effusion, pneumonia, dehydration and empyema[2] possible." Dr. Dorkan determined that Mrs. Marlow should be admitted to the hospital because of her condition. Because there were no beds at North Arundel Hospital, Mrs. Marlow was transferred to S.B.G.H. When she arrived at S.B.G.H. by an ambulance, she was immediately admitted. At one point in the testimony it is indicated that Mrs. Marlow was admitted to S.B.G.H. at 7:40 P.M. and that Dr. Dorkan had followed the ambulance to S.B.G.H. There is no great dispute as to when Mrs. Marlow arrived at North Arundel Hospital although there was conflicting evidence as to the time when Dr. Dorkan first saw her. According to Mrs. Marlow's husband the illness which necessitated his taking her to North Arundel Hospital had its onset several days earlier.

---

1. By amendment to the declaration the United States of America was added as a "use plaintiff" in order that it might recover monies expended on behalf of Mrs. Marlow under an insurance program.

2. According to *Stedman's Medical Dictionary*, Third Unabridged 'Lawyers' Edition (1972), empyema is defined as "pus in a body cavity; when used without qualification, refers to pyothorax (pus in the pleural cavity)."

Mr. Marlow stated that his wife communicated with both the personnel at North Arundel Hospital, and Dr. Dorkan. Dr. Dorkan, on the other hand, testified that Mrs. Marlow was unable to communicate clearly. Dr. Aristedes Mavrides, a resident at S.B.G.H., testified that when Mrs. Marlow arrived at S.B.G.H. he "couldn't get some specific answers from the lady." After antibiotics were administered to Mrs. Marlow, a needle was inserted into the pleural cavity and a sampling of a fluid consisting of blood and pus was extracted. It was determined by Dr. Dorkan and Dr. Mavrides that it was necessary for Mrs. Marlow to be given a thoracostomy.[3] According to Dr. Dorkan and Dr. Mavrides the problem that then confronted them was two-fold. First, they had trouble obtaining a thoracic surgeon at that time to examine Mrs. Marlow and second, her condition was such that, in the words of Dr. Dorkan, "no surgeon would have touched her." Mrs. Marlow's condition, despite the antibiotics, continued to worsen. The next day, although still very sick, she had, nevertheless, stabilized. Dr. Cerino was called to examine the patient. It was determined that Mrs. Marlow was "gravely ill" and that immediate surgery was necessary because time was running out for her, and that if the operation were going to do any good at all, it had to occur immediately. Mrs. Marlow was taken to the operating room where the thoracostomy was performed through the use of a local anesthesia. No anesthesiologist was present in the operating room. An incision of approximately one inch in length was made in her back. Dr. Cerino testified that the operation was actually performed by Dr. Samadi under the direction of Dr. Cerino. During the operation, which the record reveals was supposed to last but a short time, Dr. Cerino monitored Mrs. Marlow's heart by watching it beat against the chest wall. When he observed that Mrs. Marlow was no longer breathing he announced that fact and had her turned over onto her back. He commenced closed chest massage while Dr. Samadi simultaneously performed mouth-to-mouth resuscitation. A call was put out over the hospital inter-communication

---

3. An opening in the chest wall for the draining of empyema from the pleural cavity.

system for a CPR team,[4] and it arrived forthwith. Mrs. Marlow recovered from the empyema and pneumonia.

Approximately three weeks after the operation, Mrs. Marlow was transferred to the United States Public Health Service Hospital where she remained until her subsequent removal to the Baltimore City Hospital.

The issue presented to the jury was whether Mrs. Marlow's cardiac arrest and brain damage was caused by:

a. the failure on the part of Dr. Dorkan to treat Mrs. Marlow properly during the pre and postoperative phases of her hospitalization;

b. the failure of Dr. Cerino to exercise the requisite standard of care both prior to and during the operative procedure;

c. the failure of S.B.G.H. to afford the proper standard of care to Mrs. Marlow both before and during the operation;

d. the prior toxic affect of the "little diseases" from which Mrs. Marlow suffered at the time she first came under Dr. Dorkan's care;

e. any combination of a, b, c and d.

At the trial, the plaintiffs-appellants sought to demonstrate to the jury that Dr. Dorkan had "abandoned" Mrs. Marlow once he had caused her to be taken to S.B.G.H. This evidence was disputed by Dr. Dorkan. A battle of experts concerning the standard of medical care employed by Dr. Dorkan as a general practitioner, Dr. Cerino as a thoracic surgeon and S.B.G.H. as a hospital took place. It is clear from the verdict that the jury believed that the standard of care afforded to Mrs. Marlow by the defendants-appellees equalled the standard required.

## JURY INSTRUCTIONS

The main thrust of the appellants is that the trial court

---

4. CPR—cardio pulmonary resuscitation. Hence a team of individuals skilled in reviving a person who suffers a cardiovascular collapse.

erroneously instructed the jury on "contributory negligence" and compounded its error by an unduly repetitious instruction. Judge Shure said to the jury:

"You cannot conclude that merely because the plaintiff suffered a cardiac arrest which resulted in brain damage, that the injury was a result of the treatment or lack of care rendered by Dr. Cerino, as the mere occurrence of such a collapse does not create a presumption of negligence, as I have previously indicated to you. Also, however, I tell you that you take a patient as you find her and you treat him or her for the condition that is presented to you, but you are entitled to consider how long a condition has been present or developing when first seen by the doctor, and even though the result may have been contributed to by the negligence of other doctors or the hospital, if you conclude that Mrs. Marlow suffered the ultimate injury *by reason of her own default* in seeking medical attention which caused the empyema which ultimately resulted in brain damage, the burden has not been met and such findings would require a verdict for the defendant, Dr. Cerino." (Emphasis supplied).

Similar language was employed in the instructions pertaining to Dr. Dorkan and S.B.G.H. The appellants take umbrage with the charge, as well as with Judge Shure's refusal to inform the jury that Mrs. Marlow was not, as a matter of law, guilty of contributory negligence. The part of the instruction which the appellants find most odious is the phrase, "by reason of her own default." Appellants argue that these words placed a burden upon the appellants to disprove contributory negligence and were "tantamount to directed verdicts against them." We do not see it that way. The word default is defined in *Webster's Third New International Dictionary of the English Language* (unabr. ed. 1967), as "the absence of something needed. Lack: want."

As we read Judge Shure's instruction, the message comes through loud and clear that the jury was advised that if they

should find the proximate cause of Mrs. Marlow's injuries to be the result of negligence on the part of the appellees, or any of them, that the jury should find for Mrs. Marlow. If, on the other hand, the jury should find the proximate cause of Mrs. Marlow's injuries to have been her delay in seeking medical care so that her condition was such that she would have suffered the injuries complained of, notwithstanding the presence of due care on the part of the appellees, then the jury should find against Mrs. Marlow.

There was evidence in the case that Mrs. Marlow was suffering from a series of "little diseases" which in and of themselves made her condition moribund. Under the circumstances, the jury was entitled to consider whether or not Mrs. Marlow's prior physical condition was a significant factor in, or the sole cause of, the brain damage and blindness that she ultimately sustained.

When exception was taken by the appellants to the jury charge, Judge Shure gave additional instructions in which he said:

> "With respect to Mrs. Marlow's prior condition about which we have heard much testimony and about which there is no conflict. I say there is no conflict to the extent that she had been ill for several days before she came to the hospital to see Dr. Dorkan. If this physical condition of Mrs. Marlow was the proximate cause of the damage she suffered thereafter, then your decision must be for the defendants, but if the care of the defendants or the lack of it is negligent, as I have described it to you, and this was the proximate cause of her damage, then your decision must be for the plaintiffs."

For the reasons heretofore stated we think that the original instruction was not in error, but even if it were, the judge's subsequent instruction relative to proximate cause cured any possible misapprehension on the part of the jurors. We perceive no error in the court's refusal to give an instruction concerning Mrs. Marlow's lack of contributory negligence. In

*Batten v. Michel*, 15 Md. App. 646, 292 A. 2d 707 (1972), we said, at 655:

"Unless there be some evidence of negligence of the plaintiff contributing to the happening of the accident beyond a mere scintilla, or evidence from which negligence may be legally inferred by reasonable persons, there is nothing which justifies the submission of the plaintiff's negligence to the jury. *Gutterman v. Biggs*, 249 Md. 421, 240 A. 2d 260 [(1968)]; see *Rice v. Norris*, 249 Md. 563, 566, 241 A. 2d 411 [(1968)]."

In the case before us we do not find even an iota of evidence that the appellees either alleged or attempted to prove contributory negligence on the part of Mrs. Marlow. Hence, the question of her contributory negligence was not at issue. Furthermore, there is no merit in the appellants' contention that the instructions were repetitive. The allegation of repetitiveness is directed to the fact that Judge Shure gave, as we have previously observed, a similar instruction as to each of the three appellees. The Court of Appeals, addressing itself to the subject of repetition of jury instructions said in *Ager v. Baltimore Transit Co.*, 213 Md. 414, 132 A. 2d 469 (1957), at 423:

"While undue repetition, in an instruction, of any of the points contained therein is not to be recommended, a violation of this rule is not reversible error, unless it reasonably appears that the jury has been misled. 3 *Am. Jur., Appeal and Error*, sec. 1118."

In the instant case there is nothing to indicate that the jury was misled or confused by repetitive instructions.

The appellants requested three prayers concerning the professional responsibility owed by Dr. Dorkan to Mrs. Marlow. In essence, the prayers sought to have the jury instructed that it was Dr. Dorkan's duty to arrange for and administer antibiotics to Mrs. Marlow, to arrange for the drainage of the empyema and that Dr. Dorkan's physical

presence was required to make informed, professional judgments rather than to rely upon the judgment of others. Judge Shure in his instruction said of Dr. Dorkan:

> "The charges against him are that he failed to promptly obtain a thoracic surgeon for assistance, that he failed to treat or failed to treat properly Mrs. Marlow, and that he abandoned her as a patient.

* * *

> "In evaluating the testimony in this claim, you consider all of the evidence presented from the time that Dr. Dorkan came into the picture at North Arundel Hospital and his actions thereafter, including his medicines prescribed, the instructions to Dr. Mavrides, the hospital charts, his contact with employees of the hospital, thoracic surgeon, his return to Severna Park, and his actions thereafter, including specifically instructions and what you consider attention or lack of attention after he left the hospital and from then until the end result in Mrs. Marlow."

To support their position that the instruction is erroneous, the appellants point to the testimony of one of their experts, Dr. Reap, who stated that Dr. Dorkan should have stayed with Mrs. Marlow until her condition had stabilized and that she should have been admitted into the intensive care unit from the time she arrived at S.B.G.H. Plaintiffs rely heavily upon *Thomas v. Corso*, 265 Md. 84, 288 A. 2d 379 (1972). In that case a doctor who lived approximately ten minutes from the hospital was called to attend an individual who had been struck by a motor vehicle. The doctor who had been telephoned at 11:25 P.M. arrived at the hospital at 2:30 A.M., just in time to pronounce the patient dead. The Court of Appeals, speaking through Judge Barnes, said at 98:

> "In 1 Louisell and Williams, *Medical Malpractice*, § 8.05, pp. 206-07, it is stated:
> 'The duty to attend the patient after a

physician-patient relationship has been established is a clearly defined specific duty within the general duty of due care. A physician cannot properly withdraw from a case under diagnosis or treatment without giving reasonable notice. How much attention a particular case may require in order to satisfy the standard of reasonable care, often is a matter for expert evidence. *It requires no expert evidence, however, to show that failure altogether to attend a patient, when common sense indicates that without attention the consequences may be serious, is not reasonable care.'* (Emphasis supplied.)"

*Thomas v. Corso, supra,* is not apposite to the instant case. We are not here concerned with the question of the doctor's failure to attend a patient. The issue is whether having once undertaken to attend the patient, Dr. Dorkan fulfilled his duty. The testimony of Dr. Dorkan and his expert witnesses was that Dr. Dorkan had done all that could be expected of him and that his services met the degree of professional responsibility required. The requested instructions completely ignore the evidence presented by Dr. Dorkan and were almost the equivalent of a motion for a directed verdict in favor of the appellants.

Dr. Cerino related to the jury that when he first saw Mrs. Marlow she was *moribund* (dying; at the point of death). The doctor said "she was going to die because of the multiplicity of the little diseases she was suffering from." She was in "septic shock which carries a mortality rating of ninety per cent on people with no additional diseases. This lady was suffering from uncontrolled diabetes and you know I don't have to tell you that people with diabetes are prone to infections and do not heal as well."

There was evidence that Mrs. Marlow had a history of chronic alcoholism for which she had been treated over a period of years. The last "treatment" was in 1963, but there was an entry on the Taylor Manor hospital records that Mrs. Marlow's husband had called Taylor Manor in 1967 and told

them that his wife was having a relapse. Moreover, the "history" entered in the records of the United States Public Health Service Hospital, to which Mrs. Marlow was taken following her discharge from S.B.G.H., reveals that:

"The past history is significant in that Mrs. Marlow had formerly, on several occasions. been schizophrenic. In 1963, she was hospitalized for six months at Taylor Manor. She denied smoking; however, her husband did note that she had been drinking quite heavily over the past few weeks prior to admission to South Baltimore General Hospital."

There is an additional note: "drink — whiskey — on weekends — increasing for three or four months."

The importance of the history of alcoholism was pointed up in the testimony of Dr. Cerino who said:

"And chronic alcoholics [sic] creates many changes in the brain, liver and other organs that make a patient more susceptible to infection and more difficult to treat. She had her chest full of pus. Not only that but the right lung was completely involved by pneumonia. At the time I saw her she was incoherent and unable to speak, telling me that the germs or the toxins in the blood stream already affected her brain."

In the light of the testimony as above recounted, Judge Shure properly refused the appellants' prayer:

". . . that, as a matter of law, there is no evidence legally sufficient to justify an inference that plaintiff's pneumonia or empyema was caused by a prior alcoholic condition, and you are not to speculate as such in your deliberations."

In addition to Dr. Cerino's evidence, there was testimony from an expert that:

". . . [P]atients with diabetes, cancer, alcoholism . . . are more likely to develop these kinds of complications, particularly empyema."

The requested instruction, had it been given, would have been directly contrary to the evidence. The trial judge was not in error.

Appellants next assert that the court erred in refusing to instruct the jury that there was no legally sufficient evidence to justify an inference that "the cardiac arrest or cardiovascular collapse suffered by plaintiff, Lucille Marlow, was caused by a prior alcoholic condition, or that the widespread cortical destruction, permanent brain damage, blindness and incompetence suffered by plaintiff, Lucille Marlow, was caused by a prior alcoholic condition . . . ." The requested prayer also ignores the evidence. Dr. Cerino testified that "in the case of Mrs. Marlow . . . [the] profound cardiac respiratory collapse . . . was the end result of her multiple diseases," the diseases, as we have previously observed, included alcoholism. We perceive no error.

While it is difficult to follow the appellants' argument concerned with the trial judge's failure to grant the appellants' 19th prayer, the thread running through the appellants' contention seems to be that the trial court's instructions on proximate causation were erroneous. The Court of Appeals, speaking through the late Judge Finan in *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 258 A. 2d 595 (1969), quoted with approval *State, Use of Janney v. Housekeeper*, 70 Md. 162, 16 A. 382 (1889). The Court in *Housekeeper, supra* at 172, approved a prayer in which the jury was told:

> ". . . that the degree of care and skill required [of treating physicians and surgeons] is that reasonable degree of care and skill which physicians and surgeons ordinarily exercise in the treatment of their patients, and that the burden of proof is on the plaintiffs to establish the want of such skill and care in the performance of the operation and attendance on the deceased while under treatment."

Judge Shure instructed the jury that:

> ". . . to be liable under the law, you must find

that they did not use the requisite skill and judgment insofar as this plaintiff, Lucille Marlow, is concerned. That is that care and skill in judgment which is ordinarily exercised by others in the profession generally in the Baltimore area or in a similar metropolitan area.

The lack of skill and judgment, additionally, must be the proximate cause of the condition which in this case, as you will recall, is brain damage which has caused the blindness and incompetency.

Proximate cause is the cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces a condition that is in this case the condition without which the results would not have occurred. It need not be the only cause but it must be a proximate cause which is the efficient cause; namely, the one that necessarily sets in operation the factors that accomplished the results.

Now, as I have indicated, the plaintiff has the burden of establishing every fact necessary to constitute malpractice, which includes the lack of requisite knowledge and skill for the performance of services generally, and particularly in this case either rendered or failed to have been rendered to Lucille Marlow and that such services or the failure to render was the proximate cause of the plaintiff's complaints.

A physician and/or surgeon and those employees in a hospital are not required to exercise the highest degree of skill and care in the profession but rather the degree of skill and care ordinarily possessed and exercised by others of their fellow doctors, nurses and other hospital employees in the profession generally. Errors in judgment, for instance, alone, are not sufficient to constitute malpractice. Failure to produce the desired results of itself is not sufficient to constitute malpractice; however, if a physician and/or a surgeon does not possess or does not exercise or practice that degree of learning and

skill required of him by law, that is a standard I have given to you, he cannot be excused from recovery by merely saying that he did the best that he could. When you hold yourselves out to the public as a professional doctor, you must perform, as I have indicated, up to these professional standards."

In our view Judge Shure's instructions were in keeping with *Housekeeper, supra,* as approved by *Johns Hopkins Hospital v. Genda, supra. See also State, Use of Solomon v. Fishel,* 228 Md. 189, 179 A. 2d 349 (1962); *State v. Washington Hospital,* 223 Md. 554, 165 A. 2d 764 (1960); *Bettigole v. Diener,* 210 Md. 537, 124 A. 2d 265 (1956); *State v. Eye, Ear, Etc., Hospital,* 177 Md. 517, 10 A. 2d 612 (1940); *Miller v. Leib,* 109 Md. 414, 72 A. 466 (1909); *Dashiell v. Griffith,* 84 Md. 363, 35 A. 1094 (1896). Intertwined in the appellants' argument on this issue is an "instant replay" of the assertion made relative to "contributory negligence". Having journeyed through the applicable law concerning that contention, we see no reason to repeat the trip.

Appellants next argue that there can be more than one proximate cause of an injury. The statement is correct. *See Yellow Cab Co. v. Bonds,* 245 Md. 86, 225 A. 2d 41 (1966); *Yellow Cab Co. v. Hicks,* 224 Md. 563, 168 A. 2d 501 (1961); *Armiger v. Balto. Transit Co.,* 173 Md. 416, 196 A. 111 (1938). In the original instructions Judge Shure, as we have already noted, stated:

"Proximate cause is the cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces a condition that is in this case the condition without which the results would not have occurred. It need not be the only cause but it must be a proximate cause which is the efficient cause; namely, the one that necessarily sets in operation the factors that accomplished the results."

The supplemental instructions provided,

"If this physical condition of Mrs. Marlow was

the proximate cause of the damage she suffered thereafter, then your decision must be for the defendants, but if the care of the defendants or the lack of it is negligent, as I have described it to you, and this was the proximate cause of her damage, then your decision must be for the plaintiffs.

Proximate cause I described to you and it need not be the only cause but must be a necessary cause for the damages to have been sustained."

We believe Judge Shure's instructions make it perspicuous that there can be more than one proximate cause, and we think that the trial judge's instructions were adequate.

As we said in *Beckner v. Chalkley*, 19 Md. App. 239, 310 A. 2d 569, 574 (1973):

"The Court of Appeals and this Court have consistently held that if jury instructions, when read as a whole, clearly set forth the applicable law, there is no reversible error. *Nizer v. Phelps*, [252 Md. 185, 249 A. 2d 112 (1969)]; *Alston v. Forsythe*. 226 Md. 121, 172 A. 2d 474 (1961); *Lemons v. Chicken Processors*, 223 Md. 362, 164 A. 2d 703 (1960); *Kable v. State*. 17 Md. App. 16, 299 A. 2d 493 (1973); *Shotkosky v. State*, 8 Md. App. 492, 261 A. 2d 171 (1970). One of the reasons for such a rule is that sometimes a trial court will err in some of the legal propositions announced to the jury, but the errors are harmless. 'Wrong directions which do not put the traveler out of his way, furnish no reason for repeating the journey.' *Cherry v. Davis*, 59 Ga. 454, 456 (1877)."

Our perusal of Judge Shure's instructions to the jury convinces us that he adequately informed them as to the Maryland law.

## EVIDENTIARY RULINGS

The appellants attack a series of evidentiary rulings made during the trial. Appellants' main assault, however, is on

the admission into evidence of the records of Crownsville State Hospital, Taylor Manor Hospital and the United States Public Health Service Hospital. The reason for the appellants' assault upon those three rulings in particular appears to be that if they were excluded from the record, there would be little or no evidence concerning the history of Mrs. Marlow's alcoholism. Thus, the debilitating effect upon the body of Mrs. Marlow resulting from alcoholism would not be an issue in the case, and the jury would have no access to knowledge concerning it. To support their argument that the hospital reports and most particularly the "psychiatric opinions" stated therein were not admissible, the appellants rely principally upon three cases: *West v. Fidelity-Balto. Bank*, 219 Md. 258, 147 A. 2d 859 (1959); *Sarrio v. Reliable Contract Co.*, 14 Md. App. 99, 286 A. 2d 183 (1972) and *New York Life Ins. Co. v. Taylor*, 79 U.S. App. D.C. 66, 147 F. 2d 297 (D.C. Cir. 1944).

In *Sarrio* we considered and held properly admitted an intern's entry in a hospital record that Sarrio was "drunk and had been drinking." We said at 101:

> "It is well established in this State that proper hospital records are admissible into evidence as records made in the regular course of business. Md. Code, Art. 35, § 59; *Yellow Cab Co. v. Hicks*, 224 Md. 563, [168 A. 2d 501 (1961)]; *Old v. Cooney Detective Agency*, 215 Md. 517 [138 A. 2d 889 (1958)]; *Bethlehem-Sparrows Point Shipyard v. Scherpenisse*, 187 Md. 375 [50 A. 2d 256 (1946)]. See also Powell, *Hospital Records in Evidence*, 21 Md. L.R. 22. However, it does not follow that the record as a whole is invariably admissible. As stated by the Court of Appeals in *Yellow Cab Co.* at 570: 'This Court has adhered to the rule that statements in a hospital record must be 'pathologically germane' to the physical condition which caused the patient to go to the hospital in the first place. *Lee v. Housing Authority of Baltimore City*, 203 Md. 453, 101 A. 2d 832 (1954); *Shirks Motor Express v. Oxenham*, 204 Md. 626, 106 A. 2d 46 (1954). A 'pathologically

germane' statement 'must fall within the broad range of facts which under hospital practice are considered relevant to the diagnosis or treatment of the patient's condition.' McCormick, *Evidence*, Ch. 32, § 290."

Appellants assert that the hospital reports were not "pathologically germane". We think appellants read more into the term "pathologically germane" than it means. As we construe the term it means having significant bearing upon and relation to the disease or injury from which one suffers. The entries in the records of Crownsville were "pathologically germane" to the particular illness that caused Mrs. Marlow's admission to Crownsville. The answer to the appellants' argument relative to their inability to "cross examine" the "psychiatric opinions" expressed in the records of Taylor Manor and Crownsville is found in *McCormick, Handbook of the Law of Evidence*, ch. 32, § 290 (1954), which states at 612:

"As in the case of expert opinions given on the witness stand, the qualifications of the declarant should appear, but it would seem that if it is proven or judicially noticed that the hospital from which the records come is a reputable institution of high standards this would justify the inference that what purport to be diagnoses made by physicians are made by doctors duly qualified to give such opinions. The admissibility of ordinary diagnostic findings customarily based on objective data and not usually presenting more than average difficulty of interpretation, is generally conceded. *Even when the diagnosis embodies a conclusion which must be based upon data unusually difficult of interpretation, or upon 'subjective' symptoms, as in the case of some psychiatric diagnoses, most courts will still receive the findings in evidence.*" (Footnotes omitted). (Emphasis supplied).

*West v. Fidelity-Balto. Bank, supra,* is inapposite. *West* dealt with the testamentary capacity to make a will. In that

case the caveators sought to offer the testimony of nurses as to entries they had made in nursing charts about the mental capacity of the testator as distinguished from his physical condition. The Court said, at 265:

> "While the charts would have been admissible as entries made in the regular course of business under Code (1957), Art. 35, §§ 59, 60, it does not follow that everything in them was competent evidence. We think it is clear that *the statute did not modify or alter the rule which forbids an expression of opinion by a person who is not competent to express an opinion.*" (Emphasis supplied).

The Court said that the nurses were obviously not qualified to express a medical opinion as to competency, and their testimony was properly excluded.

Where, however, it appears from the hospital record that the opinion is expressed by a qualified person, such an expression is admissible.

The case of *New York Life Ins. Co. v. Taylor, supra*, rejected the admission of hospital records under the "Federal Shop-Book Rule", now codified as 28 U.S.C., § 1732, on the theory that the federal statute does not open "wide the door to the avoidance of cross-examinations." The application of the federal statute was, in the view of the *Taylor* court, limited to "routine reflections of day-to-day operations." The majority felt that "conjectural conclusions" contained in a hospital report were likely to be over-valued by a jury in a case where the declarant is not presented for purposes of cross-examination. We observe that *New York Life Ins. Co. v. Taylor, supra*, involves the interpretation of the federal statute, and we are unpersuaded by its rationale. We think the sounder rule to be found in *McCormick, Handbook of the Law of Evidence*, ch. 32, § 290 (1954) wherein it is said, at 613:

> "... [I]t is believed that, even as to these controversial diagnoses, the majority view favoring admission is the more expedient one. It works for

> simplicity by making it unnecessary to draw a difficult line, itself provocative of doubt and dispute; it serves the modern policy of the free use of organizational records; and is not too burdensome on the adversary who may himself call the declarant and thus bring out, if he can, any weaknesses of the diagnosis."

In short, the majority view is that opinions in a hospital report are admissible in evidence, and it is incumbent upon the person seeking to attack those opinions to call the declarant as a witness and examine him for weakness or error. *See also* 5 *Wigmore, Evidence,* §§ 1517-1561 (3rd ed. 1940), 6 *Wigmore, supra* at § 1707.

The testimony concerning Mrs. Marlow's alcoholism and schizophrenia was relevant for two reasons. First, it demonstrated her long history of alcoholism and the effect of the illness upon her physical condition; second, her husband claimed loss of consortium. The husband testified with regard to the loss of his wife's society, affection and companionship. Loss of consortium by a husband has been recognized by this State, and monetary damages may be awarded for ". . . the loss of services, the loss of consortium of him with his wife, which includes the loss of her assistance and her society as well as the loss of sexual relations . . . ." *Nicholson v. Blanchette,* 239 Md. 168, 180, 210 A. 2d 732 (1965). *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A. 2d 514 (1967). Consortium includes the "[c]onjugal fellowship of husband and wife, and the right of each to the company, co-operation, affection, and aid of the other in every conjugal relation." *Black's Law Dictionary* 382 (rev. 4th ed. 1968). *See also Kurdle v. Brookmeyer,* 172 Md. 246, 191 A. 416 (1937). The claim for loss of consortium by Mr. Marlow placed squarely in issue the nature and details of the relationship existing between Mrs. Marlow and her husband. Her alcoholism, schizophrenia and hospitalization at Crownsville State Hospital and Taylor Manor take on significant relevance in ascertaining the extent of the damages suffered by Mr. Marlow.

Appellants next argue that it was reversible error not to

permit a certain medical witness to testify in rebuttal. The essence of appellants' contention is stated in their proffer to the trial court that the expert would "testify to [a] reasonable medical certainty that had there been an anesthesiologist there [in the operating room] providing what Dr. Gold [another expert] has already testified to, that the result would have been different and she [Mrs. Marlow] would not have had the permanent brain damage." Judge Shure determined that the proffered testimony was cumulative and thus not proper rebuttal. The record reveals that in their case in chief the appellants, through another expert, had supplied substantially the same testimony.

The general rule concerning rebuttal evidence is found in 2 *Poe, Pleading and Practice,* § 287 (Tiffany's ed. 1925). There it is stated, at 249:

"When the defendant has concluded his testimony, the plaintiff, in those cases where the burden of proof rests on him, and where, in chief, he has accordingly gone into his whole case, is entitled to introduce what is called rebutting evidence—that is to say, evidence in regard to such new points and questions as were first opened by the defendant's evidence. The rule is that the plaintiff will be required to go fully into his own case-in-chief on these issues as to which he holds the substantial affirmative, and where, therefore, the burden of proof rests on him; and hence, in reply to the case made by the defendant, he will ordinarily be limited to what is strictly rebutting evidence. Still, it is not always easy to draw the line between what is rebutting evidence and what is evidence properly adducible in chief. The subject is one which is addressed to the sound discretion of the court; and the appellate court will not reverse for an error on this point, unless the ruling of the court below was both manifestly wrong and substantially injurious. Indeed, as a general rule, in such cases no appeal will lie." (Footnotes omitted).

See *Kaefer v. State,* 143 Md. 151, 122 A. 30 (1923); *Snowden v. State,* 133 Md. 624, 106 A. 5 (1919); *Jones v. State,* 132 Md. 142, 103 A. 459 (1918); *Bannon v. Warfield,* 42 Md. 22 (1875). *Jenkins v. State,* 14 Md. App. 1, 285 A. 2d 667 (1971); *Felder v. State,* 6 Md. App. 212, 250 A. 2d 666 (1969).

We think that the testimony sought to be offered by the appellants should have been offered in their case in chief. We share Judge Shure's view that the testimony was cumulative, and we perceive no abuse of discretion on the part of the trial judge in refusing to allow the testimony as rebuttal evidence.

The appellants also maintain that other errors were committed by the trial judge in his rulings on the evidence. Those alleged errors include receipt into evidence of a letter from the director of the S.B.G.H., a hypothetical question, the refusal to permit Dr. Gold to state whether or not in his opinion Mrs. Marlow was in cardiac arrest before that cardiac arrest was observed by Dr. Cerino, and refusal to strike the testimony of an appellee's medical expert. We have reviewed the record as to each of the contentions and find no error. Even if we were to assume error, nevertheless, such error would be harmless under the totality of the circumstances of this case.

*Judgment affirmed.*
*Costs to be paid by appellants.*