471 A.2d 758

Daniel E. PAIGE, et ux.

v.

Hubert F. MANUZAK, et al.

No. 687, Sept. Term, 1983.

Court of Special Appeals of Maryland.

Feb. 15, 1984.

Certiorari Denied June 25, 1984.

Lewis Straughn Nippard, Ellicott City, and Terry B. Blair, Columbia, for appellants.

M. King Hill, Jr., and John F. King, with whom were Robert E. Scott, Jr., and David Bowers, Baltimore, on brief, for appellees.

Argued before WILNER, GARRITY and BLOOM, JJ.

BLOOM, Judge.

In the fall of 1976, appellant Daniel E. Paige began to suffer from chest congestion and a persistent cough. His symptoms also included fever and sweating. Consequently,

Mr. Paige made an appointment to see appellee Hubert Manuzak, a physician engaged in the practice of family medicine. On October 22 Dr. Manuzak examined Mr. Paige, took a complete history from him, measured his height and weight, took his temperature and blood pressure, performed a urinalysis, and ordered chest x-rays. Dr. Manuzak initially diagnosed Mr. Paige's problem to be bronchitis and emphysema, for which he prescribed an antibiotic and a cough syrup.

The x-rays ordered by Dr. Manuzak were interpreted by the radiologist as presenting a possibility of either "pneumonitis or active acid-fast infection [tuberculosis]." The interpretation also indicated "considerable generalized pulmonary emphysema." The radiologist recommended that additional x-rays be taken and that they be compared with past x-rays. New x-rays were then obtained, and the radiologist was furnished with a set of x-rays that had been taken in 1975. The radiologist thereafter submitted to Dr. Manuzak a report containing a conclusion that "[c]areful clinical correlation will be needed to exclude the possibility of reactivation of disease such as tuberculosis. If the patient is asymptomatic there is probably no immediate cause for concern and only follow-up chest examinations would merit consideration." Dr. Manuzak instructed the patient to return for another checkup and additional x-rays within a month.

On November 29 Mr. Paige returned to Dr. Manuzak's office. This visit was precipitated by an incident that had occurred a few nights earlier at his home when Mr. Paige experienced stomach distress and uncontrollable coughing, followed by vomiting and unconsciousness. His wife, appellant Joyce Paige, called for an ambulance; but when the ambulance arrived, Mrs. Paige stated that her husband was too ill to go to the hospital and that he would be all right in his own bed.

Dr. Manuzak examined Mr. Paige again and ordered another set of chest x-rays as well as a gastrointestinal series. The radiologist's report of those tests disclosed new diagnos-

tic information. The gastrointestinal series indicated a small gastroesophagel hiatus hernia. Of much greater importance, however, was the radiologist's opinion that the latest x-rays presented the possibility of lung cancer. The report stated that

> [t]he first consideration is that of bronchogenic carcinoma for the left upper lobe lesion and it is possible a second malignancy is present in the right lung apex although there is evidence of chronic obstructive pulmonary disease and the latter lesion, or possibly even both lesions, may be scarring from old inflammation.

Upon reviewing that report, Dr. Manuzak contacted Mrs. Paige and told her that her husband might have lung cancer and that he had arranged for Mr. Paige to be examined by a thoracic surgeon, appellee Michele Cerino. On December 8 Mr. Paige was seen by Dr. Cerino at Dr. Cerino's office. After reviewing Paige's x-rays, examining him and taking his history, Dr. Cerino informed appellants that it was highly probable that Mr. Paige had cancer. Dr. Cerino explained that certain diagnostic procedures would confirm the presence or absence of cancer. He also explained that surgery would be performed only if tests indicated that the cancer had not spread to the right lung.

On December 13 Mr. Paige was admitted to Greater Baltimore Medical Center (G.B.M.C.) in Towson where various pre-operative diagnostic tests were performed. A fourth radiological interpretation was obtained by Dr. Cerino on that date. It reported that "worrisome" changes had occurred in the patient's left upper lobe and that these changes "may be secondary to a neoplasm [cancer]." Dr. Cerino also ordered a tomogram (a procedure in which radiographic pictures are taken at various tissue levels) to be performed on Paige's left lung. The tomogram, performed on December 14, indicated that the condition of the right apex of the upper lobe was "worrisome as to the possibility of a neoplasm developing in this area." The tomography report also stated that the problems in other areas of the lung may have been infectious in nature.

Also on the 14th Dr. Cerino performed a bronchoscopy, a procedure whereby a lighted scope was inserted into the patient's lung, enabling the physician to inspect the lungs and also retrieve, by means of brushings and washings, cells and fluids from the lung. The materials thus obtained from Mr. Paige's lungs were examined by appellee Rudiger Breitenecker, a physician employed by Dr. John E. Adams, another appellee, in the pathology laboratory at G.B.M.C. In identifying the results of his cytologic examination, Dr. Breitenecker utilized a standard system whereby cells are classified by Roman numeral designations ranging from Class I (normal) to Class V (definitely cancerous). Dr. Breitenecker labeled Paige's cells Class V. In addition to that designation, Dr. Breitenecker's report stated that "there are abnormal groups of cells present suggestive of a poorly differentiated carcinoma (adeno)."

The washings from the bronchoscopy were also tested for the presence of tuberculosis. An acid-fast test performed on sputum smears collected by the bronchoscope was negative for the presence of tuberculosis bacilli. Some material taken from the lung was also placed in a culture medium to check for eventual growths of tuberculosis germs. The results from culturing are generally not available for about six weeks from the date of the test.

On December 17 Dr. Cerino operated on Mr. Paige. During the course of the surgery, Dr. Cerino forwarded a lesion from the patient's right lung to the pathology lab for evaluation. The report from pathology described the specimen as granulamatous disease with a caseating module, i.e., tuberculosis. That report eliminated Dr. Cerino's concern that cancer from the left lung might have spread to the right lung, so the surgeon removed portions of Mr. Paige's left lung and forwarded them to the pathology lab. Those portions were evaluated as being carcinoma *in situ,* an early stage or pre-cancerous condition. The final postoperative pathology report concluded that the excised portions of the left lung showed no evidence of malignancy. Dr. Cerino testified that he spoke to Dr. Adams about the discrepancy

between the finding of Class V cells and the report of carcinoma *in situ* on one hand and the final pathology report on the other. Dr. Cerino claimed that Dr. Adams reported to him that Paige did indeed have an early stage of cancer.

Mr. Paige developed numerous post-surgical complications. He was hospitalized until Easter of 1977 and was near death on a number of occasions. Sometime late in February the culture test was completed, and it was positive for tuberculosis.

Appellant and his wife filed a claim against Dr. Manuzak, Dr. Cerino, Dr. Breitenecker, Dr. Adams, and G.B.M.C. in the Health Claims Arbitration Office. At the hearing appellants called Dr. Benjamin H. Minchew, a board-certified internist with a sub-speciality interest in infectious disease, to testify that the various appellees had failed to adhere to their respective standards of care. Although Dr. Minchew was allowed to express his opinion as to Dr. Manuzak, the panel chairman refused to allow such testimony as to Dr. Cerino on the ground that an internist is not qualified to render an opinion as to the standard of care applicable to a thoracic surgeon. Appellants then rested their case, whereupon the Health Claims Arbitration Panel ruled in favor of all appellees.

Appellants thereafter sought review in the Circuit Court for Anne Arundel County. Their motion to vacate the panel's ruling was granted as to Dr. Cerino but denied as to the other appellees. Subsequently, appellants' suit against all of the appellees went to trial in the circuit court.

Appellants' declaration alleged that appellees were negligent in failing to diagnose Mr. Paige's condition as tuberculosis and in failing to provide adequate pre-operative and post-operative care. Dr. Manuzak and Dr. Cerino were alleged to have failed to disclose material facts concerning Mr. Paige's condition. There was a claim for loss of consortium and damage to appellants' marital relationship.

At the close of appellants' case, motions for directed verdicts were granted as to Dr. Manuzak and G.B.M.C. The

jury returned a verdict in favor of the other appellees. Appellant then brought this appeal, presenting to us the following questions:

    I.   Did the court err in excluding appellant's testimony as to consent to surgery?

    II.   Did the court err in restricting argument on behalf of appellants?

    III.   Was the parol evidence rule violated when testimony of the witness altered the report of Dr. Bauer?

    IV.   Did the court err in permitting improper argument on behalf of Dr. Cerino?

    V.   Did the court err in granting Dr. Cerino's [sic] motion for a directed verdict?

    VI.   Did the court err in failing to vacate the arbitration award as to all appellees?

## I

At trial Mr. Paige was asked the following question: "Now if he [Dr. Cerino] had told you [of] the presence of tuberculosis would you have submitted to the operation?" The court sustained an objection to that question. Appellants contend that the question was a relevant one and that the trial court erred in ruling that Paige's answer was inadmissible.

In making this argument, appellants rely upon the decision of the Court of Appeals in *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977), in which the Court addressed the doctrine of informed consent. That doctrine

> imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

*Id.* at 439, 379 A.2d 1014 (citations omitted).

At trial appellants argued that Dr. Cerino breached his duty to disclose, in that he failed "to reveal to [Mr. Paige]

the nature of the ailment. . . ." *Id.* at 440, 379 A.2d 1014. Appellants' position was that Dr. Cerino never informed Paige that he was, or may have been, suffering from tuberculosis and that, if Paige had been so informed, he would not have consented to lung surgery.

The Court in *Sard* held

> that the causality requirement in cases applying the doctrine of informed consent is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed. If disclosure of all material risks would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his damage. If, however, disclosure of all material risks would have caused a reasonable person in the position of the patient to refuse the surgery or therapy, a causal connection is shown. Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue.

*Id.* at 450, 379 A.2d 1014.

Appellants argue that since the patient's "hindsight testimony" is relevant, the court erred in sustaining the objection to the question which sought to elicit that "hindsight testimony." That argument, however, must be examined in the context of the pleadings and the evidence.

Appellants' declaration alleged, *inter alia,* that Dr. Cerino failed to disclose to Mr. Paige "(a) the nature of his ailment; [and] (b) the fact that his symptoms and illness have been caused by a condition other than carcinoma. . . ." Paige's testimony leading up to the question that was disallowed was as follows:

Q. Okay. What did Dr. Cerino say to you?

A. He looked at the x-rays and he says this is not scars I'm looking at, not pneumonia scars but that they are tumors and I said well, what does that mean, and he says, well, it could be cancer. There's a possibility of cancer,

and that, you know, naturally scared me so he says we'll have to run some tests at the hospital, says if it was up to me now, I'd send you right on to the hospital because these tumors grow by the hour and not by the month or the year.

Q. He said if it was up to him what?

A. That he would send me right on to the hospital for an operation.

Q. Did you say anything to him in response to that?

A. Yes, I did. I told him that I didn't want no operation if there's any other way out, and I had hopes that—

Q. Wait a minute, you didn't want any operation if there was any other way out, is that right?

A. Any other way, I didn't want an operation. I didn't want no exploratory. That's the way I put it. I don't want to [sic] exploratory operation if you can prove to me medically that I have cancer, then it will have to be. I have no recourse.

Q. Did Dr. Cerino say anything to you about your having tuberculosis?

A. No, sir.

Q. Did he tell you that there was an indication from the x-ray reports of the possible presence of tuberculosis?

A. No, sir.

Q. He didn't tell you at that time in his office, did he ever tell you in the hospital before you were operated on?

A. No, sir.

Q. He didn't tell you at that time in his office, did he ever tell you in the hospital before you were operated on?

A. No, sir.

Q. Now if he had told you the presence of tuberculosis would you have submitted to the operation?

A. Never.

MR. KING [Counsel for Dr. Cerino]: I object.

A. No.

COURT: Sustain the objection. Just a minute. The jury will disregard the last remark.

Considering the allegations of the declaration as well as the questions that preceded it, the disallowed question can only be construed as inquiring of Mr. Paige if he would have consented to the operation if he had been informed that he had tuberculosis only, i.e., tuberculosis *instead of* cancer, not tuberculosis *in addition to* cancer.

■ For an item of evidence to be admissible, it must be both relevant and material. Evidence is material if it tends to establish a proposition that has legal significance to the litigation. Evidence is relevant if it is sufficiently probative of a proposition that, if established, would have legal significance to the litigation. 1 Wigmore, *Evidence* § 2 (Tillers rev. 1983).

■ Here, the question asked of Mr. Paige, if relevant (as suggested by *Sard v. Hardy*), was "relevant" to an immaterial proposition. That is, it tended to prove a proposition that had no legal significance to the litigation—that Mr. Paige would not have consented to the surgery if he had been told *only* that he had tuberculosis. That proposition is contrary to the facts confronting both surgeon and patient at the time in question. When Mr. Paige was referred to Dr. Cerino, the surgeon was faced with a radiological report which stated, "[f]indings very suggestive of left upper lobe bronchogenic carcinoma and possibly a second right upper lobe malignancy." The fact that Dr. Cerino, at all times, had some evidence that Mr. Paige was suffering from lung cancer is beyond dispute. The proposition was also contrary to common sense. Obviously, no one would consent to an operation for cancer if told that he had tuberculosis but not cancer. The question, therefore, was properly excluded.

Even if we were to assume, *arguendo,* that the court's ruling on the objection to the question was error, we would have to conclude that such error was not prejudicial to appellants and, therefore, not reversible. We "will not reverse for an error by the lower court unless that error is

'both manifestly wrong and substantially injurious.' ...
An error which does not affect the outcome of the case is
'harmless error....'" *I.W. Berman Prop. v. Porter Bros.,*
276 Md. 1, 11–12, 344 A.2d 65 (1975) (citations omitted).

█ The jury's verdict was necessarily based upon a find-
ing either that the existence of tuberculosis was not a
material fact or that disclosure of the presence of tuberculo-
sis would not have deterred a reasonable person in Mr.
Paige's position from submitting to surgery for lung cancer.
*Sard v. Hardy, supra.* In either event, Mr. Paige's response
to his counsel's "what if" question would not have affected
the outcome of the case.

## II

Appellants contend that the trial court erred in sustaining
appellees' objection to remarks made by appellants' counsel
during closing argument. In the course of the argument,
counsel made reference to the cytology report prepared by
Dr. Breitenecker. That report referred to the analyzed cells
as being Class V in nature but also stated that "there are
abnormal groups of cells present suggestive of a poorly
differentiated carcinoma (adeno)." Appellants asserted that
the report was misleading and ambiguous in that the two
cellular descriptions are contradictory. While a Class V
description definitely indicates a malignancy, the written
text accompanying that description, argued appellants, only
suggests a possibility of a malignancy which, in effect,
would reduce the Class V designation to something between
Class IV and Class V.

In an attempt to convince the jury that the descriptions
were conflicting and that the written text should control,
counsel drew an analogy to bank checks. Counsel stated
that

[i]n the sense of a conflict between the words and the
numbers on the check, which do you think prevails? I
think we all know that the words prevail, and that's why
the words and numbers are used in—as a cross check

against each other, but to the extent that there's any variance between words and numbers, the words always prevail because words are more accurate.

Appellees objected to those remarks, and the Court sustained the objection, stating, "We're not talking about checks. There's different rules of law." Appellants contend that "[i]t is proper during argument for counsel to engage in oratory, illustrations and metaphorical allusions" and that the lower court erred in sustaining appellees' objection to the argument.

■ Maryland courts "have long held that counsel has great latitude in the presentation of closing arguments and any restriction on his remarks is within the trial court's discretion." *Dorsey Bros., Inc. v. Anderson,* 264 Md. 446, 454, 287 A.2d 270 (1972). Here, counsel was attempting to argue that a certain legal principle concerning negotiable instruments, Md.Com.Law Code Ann. § 3–118(c), should have determined how the jurors decided what Dr. Breitenecker was trying to say in his cytology report. While both instances involve numbers as they relate to words, there is no automatic correlation between the legal and commercial policies underlying negotiable instruments law and an explanation of what message Dr. Breitenecker was conveying in his allegedly ambiguous report. To suggest such correlation could only confuse, not enlighten, the jury. The trial court did not abuse its discretion in refusing to allow counsel to analogize rules of commercial law to the particular facts facing the jury.

### III

At trial Dr. Adams, the chief of the pathology lab at G.B.M.C., testified as to his interpretation of Dr. Bauer's conclusion in the final pathology report that there was no evidence of malignancy in Paige's lung tissues. Appellants assert that the parol evidence rule was violated when Dr. Adams' testimony "var[ied] the force, effect and meaning of the report of the examining pathologist, Dr. Bauer...." Our response to appellants' assertion is that the parol evi-

dence rule has no application to this case. "[A]s a matter of substantive law, parole evidence ordinarily is inadmissible to vary, alter or contradict a contract . . . that is complete and unambiguous. . . ." *Bernstein v. Kapneck,* 290 Md. 452, 460, 430 A.2d 602 (1981). The policy behind the rule is as follows:

> [w]here the parties to a contract have deliberately put their engagement in writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the entire engagement of the parties, and the extent and manner of their undertaking, have been reduced to writing. . . .

30 Am.Jur.2d *Evidence* § 1016 (1967).

█ Here, the document in question is not an integrated agreement between the parties. It is a laboratory report that is part of a hospital record. The parol evidence rule, being in essence a rule of substantive contract law, is of no help to appellants. *See Bernstein v. Kapneck, supra; Canatella v. Davis,* 264 Md. 190, 201, 286 A.2d 122 (1972); *Pumphrey v. Kehoe,* 261 Md. 496, 503–504, 276 A.2d 194 (1971); *Rinaudo v. Bloom,* 209 Md. 1, 6, 120 A.2d 184 (1956); 30 Am.Jur.2d, *supra,* at § 1017.

Likewise, appellants' reliance upon our decision in *Marlow v. Cerino,* 19 Md.App. 619, 313 A.2d 505 (1974), is misplaced. In that case, the admissibility of certain hospital records was at issue. We held that when "it appears from the hospital record that the opinion [contained therein] is expressed by a qualified person, such an expression is admissible." *Id.* at 636, 313 A.2d 505. Therefore, a party who wishes to enter into evidence an opinion found within a hospital record may do so by having the record itself accepted into evidence. The party need not call the preparer of the record as a witness and have that person testify concerning his opinion.

Appellants rely on the following statement from *Marlow* to support their contention that the court erred in accepting Dr. Adams' testimony:

[O]pinions in a hospital report are admissible in evidence, and it is incumbent upon the person seeking to attack those opinions to call the declarant as a witness and examine him for weakness or error.

*Id.* at 637, 313 A.2d 505 (citations omitted). Appellants read that statement as a holding that if a party seeks to attack the opinion contained in a hospital record, the only way to do so is to call the person who prepared the record as a witness and try to attack that person's opinion. Assuming that reading of *Marlow* to be correct, appellants argue that appellees were improperly allowed to attack the pathology report through Dr. Adams instead of through its preparer, Dr. Bauer. Appellants misconstrue the quoted statement in *Marlow.* *Marlow* holds that an opinion contained in a hospital record is admissible in evidence as part of the record, and it is not necessary for the party introducing the record to call the writer of the included opinion as a witness. The other party can call the writer if he wishes to attack the opinion. We did not confine the right to attack an opinion in a hospital record to an examination of the writer of that opinion.

■ In any event, the quoted language of *Marlow* has no applicability to this case. Dr. Adams was not *attacking* Dr. Bauer's opinion; he was *interpreting* it. Dr. Bauer's report consisted of a rather detailed pathological analysis of the surgically removed tissues. As such, it was couched in medical and anatomical terminology which could have little or no significance to the jury. One portion of the report, however, was couched in language which is easily understood by laymen. That statement, on which appellants placed great reliance, is "there is no evidence of malignancy." In an attempt to lessen the potentially powerful impact of that isolated passage, appellees relied upon Dr. Adams' expert testimony. Dr. Adams gave his interpretation of the language employed by his subordinate in the G.B.M.C. pathology lab, Dr. Bauer. Thus, Dr. Adams' testimony was offered as an aid to the jury in interpreting the *entire* report. In that way, appellees attempted to have the

jury view the potentially damaging phrase in light of the entire report rather than give undue weight to what Dr. Adams characterized as a misplaced comment. The trial judge did not err in allowing Dr. Adams to so testify. The fact that Dr. Adams is the chief of the pathology lab would be a significant factor in concluding that he was qualified to interpret his subordinate's report. The weight to be given that interpretation, if any, considering that Dr. Adams had a direct interest in the case, was for the jury.

IV

Appellants' fourth contention is that Dr. Cerino's counsel "was permitted, over objection, to ask the jury to base its verdict on factors extraneous to the issues of the case." The objected-to motion of counsel's closing argument was as follows:

MR. KING [Dr. Cerino's counsel]: May it please Your Honor, Mr. Foreman, members of the jury, on behalf of Dr. Cerino, I want to thank you for your attention and obvious interest and concern which you have shown over what has not been the—a short trial, of course, it hasn't been a long one either, but I hope and trust it's not been one that's not been without interest. I want to assure you that it's a matter of grave concern and interest to Dr. Cerino, and you might imagine to physicians and surgeons who undertake to treat and hopefully cure people who have cancer, and I want to say that at the outset—

MR. NIPPARD [Appellants' counsel]: Your Honor, I want—I want to object to the concern of others other than the parties.

COURT: Overrule the objection.

■   As we noted in Part II, "counsel has great latitude in the presentation of closing arguments and any restriction on his remarks is within the trial court's discretion." *Dorsey Bros., Inc. v. Anderson, supra.* Here, counsel was commenting that the factual issues of the case presented matters of grave concern to Dr. Cerino and that other physicians would

also be concerned if they were confronted with a similar situation. The trial judge did not abuse his discretion in overruling appellants' objection; counsel's comments were neither overreaching nor improper.

## V

Appellants contend that the trial court erred in granting the motions of Dr. Manuzak and G.B.M.C. for directed verdicts. In their brief appellants argue that "there was ample evidence of Defendant Manuzak's failure to meet general standards of medical practice in his examination and treatment of the Plaintiff, Daniel Paige." We agree that appellants presented sufficient evidence of a breach of Dr. Manuzak's standard of care. The trial court correctly ruled, however, that appellants produced no legally sufficient evidence which tended to show that Dr. Manuzak's breach was a proximate cause of appellants' injuries and damages.

> [T]he burden of proof in a malpractice case is on the plaintiff to show a lack of the requisite skill or care on the part of the physician *and that such want of skill or care was a direct cause of the injury; if proof of either of these is wanting, the case is not a proper one for submission to the jury.*

*Suburban Hosp. Ass'n v. Mewhinney,* 230 Md. 480, 484, 187 A.2d 671 (1963) (citation omitted) (emphasis added).

■ Here, there was no proof as to causation. Appellants' theory was that Dr. Manuzak had breached his duty of care by failing timely to diagnose and treat Mr. Paige's tuberculosis. Appellants assert that Dr. Manuzak was negligent in failing to perform a tuberculosis skin test and/or a sputum smear test when he initially examined Mr. Paige. Accepting, *arguendo,* appellants' accusations of negligence to be true, there is no evidence to show that any of these omissions was a proximate cause of Mr. Paige's injuries. Appellants' expert witnesses testified that a skin test is only a screening procedure. If the result is positive for tuberculosis, the next step is to order chest x-rays—a step already

taken by Dr. Manuzak. Also, there is no dispute that four sputum smears were taken while Mr. Paige was at G.B.M.C. and that those tests were all negative. Appellants presented no evidence to indicate that earlier smears would have indicated anything other than negative results as did those performed at G.B.M.C. The sputum culture performed at G.B.M.C. did show the presence of tuberculosis. The results of a sputum culture, however, are generally not available for at least six weeks. Thus, if Dr. Manuzak had taken a sputum sample and had then conducted a culture test, the results would not have been available until after the patient had been referred to Dr. Cerino.

Appellants' experts conceded that Dr. Manuzak's referral to Dr. Cerino was appropriate in light of the radiological reports indicating the probability that Paige was suffering from lung cancer. Moreover, appellants' experts agreed that any delay in diagnosing or treating Paige's tuberculosis caused no harm to him.

Appellants argue that Dr. Manuzak's failure to diagnose tuberculosis and inform Dr. Cerino of that diagnosis resulted in Dr. Cerino performing an unnecessary operation. That proposition has no support in the evidence. Dr. Cerino testified that he performed his own independent examination and analysis of Mr. Paige's condition and that his treatment of Mr. Paige was in no way influenced by anything Dr. Manuzak did or did not do. Indeed, Dr. Cerino testified that at all times prior to surgery, he was aware of the possibility that Paige had tuberculosis and that that fact did not change the course of his action.

Thus, after viewing the evidence and all inferences fairly deducible therefrom in the light most favorable to appellants, we hold that the trial court did not err in directing a verdict in favor of Dr. Manuzak.

Similarly, the court was correct in directing a verdict in favor of G.B.M.C. Appellants argued at trial that G.B.M.C. was negligent in administering one dose of penicillin to Mr. Paige after his surgery despite a notation on his medical

chart that he was allergic to penicillin. We have no doubt that this was a negligent act; but neither of appellants' expert witnesses offered an opinion as to what, if any, injury Mr. Paige suffered as a result of the penicillin injection. Indeed, one of those experts testified that Paige's post-operative difficulties were direct results of the surgery. Since appellants presented no evidence that G.B.M.C.'s administration of penicillin to Mr. Paige caused any harm to him, the trial court was correct in directing a verdict in G.B.M.C.'s favor.

## VI

At the arbitration proceeding, appellants called Dr. Benjamin H. Minchew, a board-certified internist with a sub-specialty interest in infectious disease, to testify as to the appellees' alleged failure to adhere to their respective standards of care. Dr. Minchew's testimony was accepted as to Dr. Manuzak but not as to Dr. Cerino. This ruling, in appellants' words, "operated to totally frustrate the presentation of the Appellant's [sic] case in chief." Appellants rested their case, and the arbitration panel subsequently ruled in favor of all of the appellees.

The trial court ruled that Dr. Minchew should have been allowed to testify as to the proper standard of care chargeable to Dr. Cerino. The panel's ruling in favor of Dr. Cerino was vacated,[1] but the ruling in favor of the others was allowed to remain intact. Contending that the trial court should have vacated the ruling as to all of the appellees, appellants assert that Md.Cts. & Jud.Proc.Code Ann. §§ 3–2A–06(c), 3–224(b)(4), gives "[n]o leeway ... for a partial vacation of the award. The statute and basic principals [sic] of fairness dictate that this case should not have been presented to the jury with any presumption attaching

---

1. Md.Cts. & Jud.Proc.Code Ann. § 3–224(b)(4) provides for vacation of an award if the arbitrators "refused to hear evidence material to the controversy, ...." We do not suggest that this provision would be applicable to every allegation of error in ruling on admissibility of evidence.

to the arbitration proceeding." Appellants complain that the case should have gone to the jury without the presumption of correctness.

In *Attorney General v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978), the Court of Appeals addressed various constitutional questions concerning the Health Care Malpractice Claims statute and the Health Claims Arbitration Office which the statute created. In its opinion the Court discussed the presumption of correctness which follows the panel's decision to the circuit court.

> "[I]t simply puts the burden of proof upon the party taking the appeal, whether he be plaintiff or defendant. In other words *it establishes no new rule when the plaintiff happens to be the party appealing,* as the burden was always upon the plaintiff to prove his case." ... We have further explained that the provision "means nothing more than that, if the mind of the trier of fact is in equal balance on the evidence in record, the finding of the Commission should be affirmed." ... When the malpractice claimant is the party appealing, the statutory provision thus has no effect whatever on his burden of proof in respect to primary negligence.

*Id.* at 293–294, 385 A.2d 57 (citations omitted) (footnote omitted) (emphasis in original).

    Hence, vacation of the panel's decision would have had no effect on appellants' status at trial. If the ruling had been vacated, appellants, as plaintiffs, would still have carried the burden of proof. Because the ruling was not vacated, appellants were faced with the presumption that the panel's decision was correct. The Court of Appeals has instructed us that the two situations impose precisely the same burden upon a plaintiff. We hold, therefore, without deciding whether the trial court erred, that appellants were not prejudiced by the court's refusal to vacate the panel decision as to all appellees.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.