Commonwealth *v.* Jones, Appellant.

Argued December 7, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent.)

*Douglas Riblet,* Assistant Defender, with him *John W. Packel,* Assistant Defender, and *Vincent J. Ziccardi,* Defender, for appellant.

*Albert Becker,* Assistant District Attorney, with him *James T. Ranney* and *David Richman,* Assistant District Attorneys, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., June 21, 1974:

Appellant was found guilty by a jury of two counts of aggravated robbery; a prior trial for the same offenses had ended in a hung jury. Appellant claims that he is entitled to a new trial because the Commonwealth's cross-examination of him during the second trial was unnecessarily prejudicial in that the jury could infer from it that he had not taken the stand in the first trial. We agree.[1]

The charges arise out of an alleged robbery of a seafood restaurant at 10:00 p.m. on January 12, 1972. The Commonwealth's evidence at the second trial consisted of testimony by two persons who said they were victims of the robbery, the two investigating officers, the arresting officer, and the owner of the restaurant.

Vivian Eason testified that she was employed at the restaurant on the night in question. She identified appellant as the man who entered the restaurant in the company of a second black male, pointed a gun at her, and removed approximately $45.00 from the cash register. She said that when Mr. Walton, her supervisor, started down a stairway that leads from his room into the store to see what was going on, appellant ordered

_____

[1] It is therefore unnecessary to reach the other two issues raised by appellant: (1) that the trial judge deprived appellant of a fair trial by emphasizing the prosecution's case; and (2) that the jury instructions were defective on the issue of reasonable doubt.

him to come down and then removed money from one of his pockets. She also said she observed appellant's face throughout this incident, which lasted about five minutes; although she had never seen appellant on any other occasion, her in-court identification was positive and unshaken on cross-examination. Variations from testimony she had given at the first trial (as to what appellant had been wearing, the presence of a scar on his face, and the exact amount of money taken) were used on cross-examination in an attempt to impeach her credibility. She denied having told the investigating officers that the same men had robbed the store before; her testimony was muddled as to whether Mr. Walton had so informed the officers.

Officers Paul Cathers and James Abbott, who had been sent to the scene of the robbery, testified next. Officer Cathers testified that Mrs. Eason and a "colored male" (this is apparently a reference to Mr. Walton) were there, that the latter said that he had been robbed by the two men before, and that Mrs. Eason gave him a general description of the men and what they were wearing. Officer Abbott testified that there were three complainants, Mrs. Eason and two males, and that he believed they all had said they had witnessed the robbery. On cross-examination he was questioned about which man had the gun and about whether it is normal police procedure to report the suspect with the gun as the "number one man" on the standard report form. He stated, "Number one is whoever they give you first." His testimony from the first trial was used in an effort to impeach his credibility in regard to this recollection of which man he had been told had been carrying the gun.

Lemuel Walton described the incident in substantially the same way as Mrs. Eason and identified appellant as one of the robbers. He added that he knew appellant by sight, but not by name, because he had

seen him in the store with the boss's son on numerous occasions before the robbery, including one time earlier on the day of the robbery. He said that a month or two after the robbery he and Mr. Pierce (his boss) had seen appellant on the sidewalk but appellant had run away before anything could be done. He said that later he again saw appellant on the street and was able to find a police officer in time for an arrest to be made. He denied that he had told the investigating officers that the same men had robbed the store in the past. On cross-examination, his testimony at the first trial was used in an effort to impeach his credibility. He had testified on direct that money had been taken from his left pants pocket ("That is where I carry my money."), while at the first trial he had testified that the money was in his right pocket. He then said he had not made any effort to obtain appellant's name from Mr. Pierce's son because he did not see him after that; he claimed he could not recall whether he had told Mr. Pierce that his son knew the robber or not.

Jesse Pierce, the restaurant owner, testified that after the robbery and as a result of conversations with the victims he had begun looking for appellant, whom he knew as a friend of his son. He corroborated Mr. Walton's story that they had seen appellant after the robbery but that he had gotten away from them. On cross-examination he said he suspected appellant when he saw him on that occasion because Mr. Walton had told him that a friend of his son's was the robber. He further testified that he never asked his son the name of his friend whom he suspected, even though to his knowledge only one of his son's friends fit the description Mr. Walton had given him. The reason he gave for this was that he feared his son might get angry and try to injure appellant. Finally he said that appellant had come to him after his arrest and offered him money if he would not testify against him.

Appellant was the only witness for the defense. He denied participation in any robbery[2] and said that Mr. Walton had fabricated the robbery story to explain missing money and narcotics to Mr. Pierce. He said the reason Mr. Walton had charged him with a robbery on that particular day was because on that day he had purchased narcotics from him that were not potent enough to satisfy his habit. He said he went to see Mr. Walton on the afternoon of that day and demanded his money back. When Mr. Walton refused, offering instead to give him more narcotics, appellant said he grabbed a bundle of narcotics and fled. On cross-examination he testified that he had purchased narcotics from Mr. Walton on at least five prior occasions. He claimed he had been present when others had purchased narcotics at the restaurant, but he couldn't give any of their full names, nor could any of them be produced as witnesses. Appellant further stated that an alibi witness for the evening in question was not called to testify at either trial because of his prior criminal record. He also claimed that he visited Mr. Pierce to explain what happened but said he did not offer him money if he did not testify.

This appeal turns on the following exchange that occurred in the midst of cross-examination: Q. We have been referring back to a prior occasion, a prior hearing, a prior something here in City Hall on June 7, 1972 and June 6, 1972. Did you have an opportunity to testify at that time? A. Yes, I did. Q. Did you ever mention this fantastic story that you are mentioning today? MR. STANSHINE [defense counsel]: I object: BY MR. FIERSTEIN [Assistant District Attorney]: Q. (continuing) at that time? MR. STANSHINE:

---

[2] Q. Were you in the store that night?
A. No.
Q. Did you rob Mrs. Vivian Eason that night?
A. No, sir.

I object to the question. I move for a mistrial. THE COURT: Objection overruled, but eliminate the word "fantastic." MR. STANSHINE: I move for a mistrial. THE COURT: Motion denied. BY MR. FIERSTEIN: Q. I am striking the word "fantastic." Did you ever make reference or state at that prior hearing anything about the purchase of narcotics on January 12, 1972, or any time prior to that from Mr. Walton? A. I was advised not to. BY THE COURT: Q. What? A. I was advised not to. BY MR. FIERSTEIN: Q. In other words, your testimony is you did not state that; is that correct? A. I was advised not to. Q. So you didn't? A. Right. MR. STANSHINE: I object to that. THE COURT: Objection overruled. MR. STANSHINE: I would move that something be made clear on the record at side bar, your Honor. MR. FIERSTEIN: I object to this man interferring [sic] at this time. Let him make his objection to your Honor and then sit down. THE COURT: Objection overruled. MR. STANSHINE: Your Honor, Mr. Fierstein is misleading the jury. THE COURT: I have ruled. MR. STANSHINE: You haven't ruled with full knowledge of what happened on the prior occasion. THE COURT: I have ruled. MR. STANSHINE: I would like to make you aware of what happened on the prior occasion before you rule. THE COURT: You may reexamine your witness after Mr. Fierstein is through.

On redirect, counsel for appellant, apparently fearing that the jury would surmise that appellant had told a contradictory story at a prior trial, asked, "The District Attorney asked you if at the prior occasion you testified as to Mr. Pierce's involvement. At the prior occasion did you testify period?" Appellant replied, "No, sir." The motion for a mistrial was then renewed and denied.

The assistant district attorney's cross-examination was improper. Although we assume that its purpose was to impeach appellant's credibility, it could only

be used for that purpose if appellant's prior silence was of some probative value.

In *Griffin v. California*, 380 U.S. 960 (1965), it was held that comment by the court or by the prosecution that could lead the jury to infer guilt from a defendant's refusal to testify in his own behalf is a violation of the Fifth and Fourteenth Amendments of the United States Constitution and requires a new trial. *Griffin* and its progeny, relied on by appellee and the court below, deal with prejudicial remarks made at the proceeding in which the privilege is invoked. While this is not such a case, *Griffin* has been extended by decisions of other courts to preclude questioning or comment on constitutionally sanctioned silence in other contexts.

The right to remain silent at the time of arrest is on a plane with the right to remain silent at trial. It is error to admit testimony at trial that the accused remained silent and requested counsel after being given his *Miranda* warnings. *Commonwealth v. Haideman*, 449 Pa. 367, 296 A. 2d 765 (1972); *Commonwealth v. Greco*, 227 Pa. Superior Ct. 19, 323 A. 2d 132 (1974); *Johnson v. Patterson*, 475 F. 2d 1066 (10th Cir. 1973). It is likewise error to cross-examine a defendant as to why he did not make his entire exculpatory statement to the police when they arrested him. *United States v. Holland*, 360 F. Supp. 908 (E.D. Pa. 1973); *Commonwealth v. Dulaney*, 449 Pa. 45, 295 A. 2d 328 (1972). This court reversed a conviction where the defendant was asked on cross-examination whether his testimony was the same as his statement to the police, where his statement to them had to be withdrawn because it was not obtained in conformity with *Miranda*. *Commonwealth v. Burkett*, 211 Pa. Superior Ct. 299, 235 A. 2d 161 (1967).

Cases of this nature involve mixed questions of the law of evidence and constitutional law. Fifty years ago

the constitutional issue was resolved against the defendant. *Raffel v. United States,* 271 U.S. 494 (1926). *Raffel* has never been overruled, but its reasoning, that a waiver of the privilege against self-incrimination waives all claims rooted in the Fifth Amendment, has been eroded by subsequent cases such as *Griffin* and *Miranda. Raffel* came very close to being overruled explicitly in *Grunewald v. United States,* 353 U.S. 391 (1957). There it was held that the defendant's invocation of the right against self-incrimination as to certain questions before a grand jury could not be used at his jury trial to impeach the credibility of the answers he gave when the same questions were posed on cross-examination. Five justices decided the case on the basis of the law of evidence and the Supreme Court's supervisory powers, explicitly avoiding the constitutional question and a redetermination of *Raffel.* The other four justices joined in the reversal but also thought that *Raffel* should be explicitly overruled.

The lead opinion in *Grunewald* is useful in that it frames the scope of inquiry in cases such as this: What is the evidentiary value of silence that is constitutionally sanctioned? In that case it was determined that because of the ambiguous nature of a refusal to answer questions on the ground that the answer might tend to be incriminating, it could not be assumed that such silence was inconsistent with later exculpatory answers. The error thus arose not on constitutional grounds, but on a threshold question of the law of evidence: [I]t is, of course, an elementary rule of evidence that prior statements may be used to impeach the credibility of a criminal defendant or an ordinary witness. But this can be done only if the judge is satisfied that the prior statements are in fact inconsistent. 3 Wigmore, Evidence, §1040. And so the threshold question here is simply whether, in the circumstances of this case, the trial court erred in holding that [the

defendant's] plea of the Fifth Amendment privilege before the grand jury involved such inconsistency with any of his trial testimony as to permit its use against him for impeachment purposes. We do not think that *Raffel* is properly to be read either as dispensing with the need for such preliminary scrutiny by the judge, or as establishing as a matter of law that such a prior claim of privilege with respect to a question later asked at the trial is always to be deemed to be a prior inconsistent statement, irrespective of the circumstances under which the claim of privilege was made. The issue decided in *Raffel* came to the Court as a certified question in quite an abstract form, and was really centered on the question whether a defendant who takes the stand on a second trial can continue to take advantage of the privilege asserted at the first trial. . . . The Court in *Raffel,* did not focus on the question whether the cross-examination there involved was in fact probative in impeaching the defendant's credibility. In other words, we may assume that under *Raffel* [the defendant] in this case was subject to cross-examination impeaching his credibility just like any other witness, and that his Fifth Amendment plea before the grand jury could not carry over any form of immunity when he voluntarily took the stand at the trial. This does not, however, solve the question whether in the particular circumstances of this case the cross-examination should have been excluded because its probative value on the issue of [the defendant's] credibility was so negligible as to be far outweighed by its possible impermissible impact on the jury. *Id.* at 419-20 (footnotes omitted).

It would seem from this statement that cross-examination regarding prior refusal to testify would invariably be error. The right of an accused not to testify is absolute; he may not even be called as a witness unless he so chooses. To view his decision not

to testify as being inconsistent with a later exculpatory statement would be to presume that the exercise of a right that is inextricably linked to the presumption of innocence constitutes conduct that can be viewed as inconsistent with innocence.[3] Although such cross-examination might not be unconstitutional, the constitutional context in which the privilege is initially asserted strips it of the evidentiary value it might otherwise be thought to have.[4]

Assuming for the sake of argument, however, that in some circumstances cross-examination regarding prior refusal to testify might be proper, this will only be so if the trial judge can determine that the prior silence is inconsistent with the defendant's testimony. In the present case appellant's silence at his first trial was not inconsistent with his testimony at his second trial. In fact, his testimony amounts to a confession, albeit not for the crime for which he was then being tried. When pressed as to why he had not testified before, he said it was on advice of counsel, which was an explanation consistent with the incriminating nature of his testimony. This explanation, which may be combined with other more general reasons why a defend-

---

[3] The presumption of innocence and its corollary, the reasonable-doubt standard of proof, are constitutionally required. "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.' Coffin v. United States, [156 U.S.] 453 [1895]." In re Winship, 397 U.S. 358, 363 (1970).

[4] Thus the law is clear that in a civil case evidence that the witness was silent in the face of comments that would induce an ordinary man to speak is admissible under an exception to the hearsay rule. McCormick, Evidence §270 (1972); IV Wigmore, Evidence, §§1071-1073 (1972). Another (less precise) way of saying what is said in the text is that the Fifth Amendment undercuts this exception when the declarant is a defendant in a criminal case.

ant might choose not to testify (such as fear of being confused or misunderstood or a general inability to articulate) rendered appellant's prior silence consistent, or at least not inconsistent, with his later testimony.

Nor was the error harmless in this case. Although the prosecution was able to muster a good deal of evidence, the defense was based on certain inconsistencies in the witnesses' testimony. The lengthy summary at the beginning of this opinion reveals that this case was a battle of credibility with the three complainants on one side[5] and the appellant on the other. When credibility is the cornerstone of a case, even seemingly innocent or minor errors that might tend to diminish the defendant's credibility in the jury's mind will be cautiously viewed. There is the additional element that in this case the second trial was not the result of a legal technicality, but rather of a hung jury. In these circumstances we are not convinced beyond a reasonable doubt that the error was harmless. *Harrington v. United States,* 395 U.S. 250 (1969); *Chapman v. California,* 368 U.S. 18 (1967).

The judgment of sentence is reversed and the case remanded for a new trial.

WRIGHT, P. J., and SPAULDING, J., took no part in the consideration or decision of this case.

---

[5] The testimony of the police officers is consistent with both sides' stories. They were not eyewitnesses but simply testified to what the complainants told them. It is thus not necessary to disbelieve the police officers to believe appellant.