# THOMAS LEONARD RAITHEL *v.* STATE OF MARYLAND

[No. 1200, September Term, 1977.]

*Decided July 14, 1978.*

The cause was argued before THOMPSON, LISS and MACDANIEL, JJ.

*Victoria A. Salner, Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Leonard C. Redmond, III, Assistant Public Defender,* on the brief, for appellant.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Leonard Casalino, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

This is the second time appellant, Thomas Leonard Raithel, has been before this Court seeking reversal of his convictions for murder in the first degree, assault with intent to rape, and carrying a deadly weapon. In the previous appeal we affirmed the convictions in an unreported per curiam opinion, *Raithel v. State,* No. 1007, September Term, 1975 (Md. App. filed Sept. 23, 1976). That decision was subsequently reversed by the Court of Appeals because competency to stand trial was not properly determined. *Raithel v. State,* 280 Md. 291, 372 A. 2d 1069 (1977).

## I The Facts

On July 5, 1974, at approximately 9:30 P.M. Deanna Miles was fatally stabbed outside the ladies' restroom in the Old Angus Restaurant in College Park. Although the actual stabbing was unwitnessed, appellant became the prime suspect after various pieces of evidence were put together.

On the night of the murder Ms. Miles had been accompanied by Walter DeGrouchy. At approximately 9:30 P.M. she left DeGrouchy to go to the ladies' room but did not return. Her body was subsequently discovered by two patrons at the restaurant some time before 10:00 P.M. Prior to the homicide the appellant had been observed coming out of the men's

restroom and, according to the night manager of the restaurant, had been observed earlier in the evening coming through a conference room that connected a downstairs kitchen with the restroom area. Although the kitchen door was normally locked, the lock was found to be broken on the night of the murder.

After being questioned by the police, appellant finally confessed to the murder.[1] His confessions revealed that he had been harrassed by his peers and coworkers about his sexual inexperience and as a result planned a rape. On the night of the homicide he hid by the ladies' restroom, armed with a steak knife, "awaiting a victim." When Ms. Miles walked by he grabbed and choked her causing her to faint. He then "stomped her head" as she lay on the floor and stabbed her. No motive was expressed for the killing.

During the trial defense counsel attempted to suppress the confessions.[2] The trial judge noted that a motion to suppress the confessions had also been made during the previous trial. As he had presided over the first trial and remembered the testimony, the trial judge suggested that the motion be decided on the basis of the previous testimony along with any other testimony the parties wished to present. This procedure was accepted by counsel.

At the previous suppression hearing the State had produced the two police officers involved in eliciting appellant's confessions. In the course of their testimony the officers, Det. Lawrence Doman and Det. Earl Jones, gave the following account of the events surrounding the confessions. At their request appellant and his father visited the police station in an effort to clear up any suspicion. Doman told appellant's father that a polygraph examination would be the best way to resolve the matter. After discussing this possibility with his father, appellant agreed to take the test.

1. Appellant made several confessions to the crime. After questioning by the police appellant gave an oral statement admitting his guilt. Then, at the request of the police appellant allowed a tape recording and a video tape to be made of his confession.

2. The only issue raised was the voluntariness of the oral confession. If defense counsel could establish that it was involuntary it was apparently conceded that appellant's subsequent confessions would be inadmissible.

Prior to the start of the examination appellant was given his full *Miranda* warnings and was told that he was free to leave at any time.[3] After Det. Jones, who had been contacted to administer the exam, explained how the polygraph operated and asked some background questions, appellant stated that he did not want to take the test. Jones then told appellant he knew he could not take the test "because he had done it" and suggested the killing might have been accidental. When appellant agreed the killing had been an accident Jones told appellant that he did not believe him. After this exchange appellant and Jones then "got down to discussing exactly how it occurred." According to the officers' testimony, the ensuing confessions were made without any threats, inducements, or coercion.

Appellant did not introduce any evidence in support of his motion during the first hearing. During the second hearing, appellant took the stand and gave his version of the events leading up to his confessions. He claimed that his father had urged him to take the test and he consented because he "couldn't refuse [his] father." After Det. Jones connected him to the polygraph and showed him how it worked he decided he no longer wanted to take the test. At that point Jones stopped the paper in the polygraph and asked him why he had killed Ms. Miles. When this happened appellant noticed the needles on the machine started "jumping" and he told Jones to disconnect him from the polygraph. Once this was done, he "calmed down" and decided to leave. As he was halfway to the door Jones told him although he was free to leave the room, he could not leave the building because he knew he was guilty. Appellant then testified that he asked to see his father but was told his father had left to get something to eat. When he said that he would go outside and wait for him, Jones stood up in a threatening manner and told him to sit down. After several more hours of interrogation he finally confessed.

Appellant's father testified he had taken his son to the police station at about 7:00 in the evening. When his son was

**3.** Miranda v. Arizona, 384 U. S. 436, 467-473, 86 S. Ct. 1602, 1624-1627, 16 L.Ed.2d 694 (1966).

taken into the examination room he remained at the police station and did not leave at any time. After a considerable period of waiting, he inquired about the delay and was told by the police that they were having trouble with the polygraph. Finally around 2:00 or 3:00 the next morning the police informed him that his son had confessed. The State produced Det. Jones on rebuttal; his testimony was substantially the same as that given during the previous hearing.

After the evidence on the motion had been presented the following exchange occurred between the trial judge and defense counsel:

> "The Court: ... I might comment it seemed most strange to the [c]ourt that this issue wasn't raised in the previous trial, which I frankly will say to you right now does have some bearing on the credibility issue to the [c]ourt.
>
> Mr. Redmond [defense counsel]: Well, Your Honor, I can't speak for what—
>
> The Court: I understand.
>
> Mr. Redmond: — Attorney Hughes did in the first trial.
>
> The Court: I say, but your client was there, and the client's father was there and it does have some bearing in the [c]ourt's mental process in an area that is as important as this, because I think it should be abundantly clear to everybody that if these statements are suppressed, the State's likelihood of getting to a jury have been diminished greatly, because I sat through the previous trial and you about had all of the substantive testimony from the State other than these statements that they had, I think.
>
> So it is a highly critical issue, obviously, and I have to say, Mr. Redmond, I have some problem, although I will obviously read the record, I have some problem as to why today it's been raised for the first time.

Mr. Redmond: I understand that problem, Your Honor, and that is why I mentioned during our pretrial conference that I would be raising this issue that, surprisingly, to me, had not been raised in the first trial.

However, I don't have the benefit of Mr. Raithel's counsel's in the first trial's thoughts in the matter; as you well know, counsel make tactical decisions for all kinds of reasons.

The Court: That may be true, but you sure got to apply it with murder sitting there and an adult father who would have some interest in the matter. But go ahead."

The confessions were subsequently found to be voluntary and admitted into evidence.

After the State had presented its case appellant did not offer any evidence to show he had not killed Ms. Miles but maintained he was not criminally responsible at the time of the crime.

On appeal appellant maintains:

(1) It was impermissible for the trial judge to consider appellant's failure to testify at the prior suppression hearing in determining the voluntariness of his confessions;

(2) It was impermissible for the trial judge to use the prior testimony of the State's witnesses during the suppression hearing in lieu of live testimony;

(3) A psychologist should have been permitted to express an opinion on appellant's sanity at the time of the offense; and

(4) The trial judge erred in ruling that certain evidence was admissible under the business record exception to the hearsay rule.

## II Consideration of Appellant's Prior Silence
## in Assessing Credibility

Before considering the merits of appellant's claim we must first consider the State's contention that the point was not preserved for appellate review. During the suppression hearing appellant did not object to the trial judge's use of his prior silence in assessing credibility. He did object, however, when the State later introduced the confessions into evidence. We think this objection was sufficient to preserve the point. The comment in the instant case dealt with the judge's thought process in ruling on the admissibility of the confession. Appellant's objection was sufficient to allow an attack on the ultimate ruling on admissibility and, consequently, preserved for review the question as to whether or not the trial judge in reaching that decision relied on impermissible factors.

The constitutional question to be decided is whether an accused who testifies waives his right not to be cross-examined as to his silence in a prior proceeding.[4] This question was initially answered in the affirmative in *Raffel v. United States,* 271 U. S. 494, 46 S. Ct. 566, 70 L. Ed. 1054 (1926). *Raffel* involved a situation where an accused remained silent during his first trial despite accusations by a government agent that he had made incriminating admissions. The agent gave the same testimony at the second trial but this time the accused took the stand and denied the accusations. The court stated that as the accused voluntarily took the stand he could be cross-examined as to why he had not previously testified:

> "The immunity from giving testimony is one which the defendant may waive by offering himself as a witness. . . . When he takes the stand in his own

---

4. The State argues that consideration of the prior silence for impeachment does not involve a constitutional question because the comment was directed to the voluntariness of appellant's confession and not his guilt. Based on this the State reasons that the comment was not incriminating and thus appellant's right against self-incrimination was not involved. We disagree. It is obvious that the comment affected the admissibility of the confessions and they were certainly incriminating.

behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue. . . . He may be examined for the purpose of impeaching his credibility. . . . His failure to deny or explain evidence of incriminating circumstances of which he may have knowledge, may be the basis of adverse inference, and the jury may be so instructed. His waiver is not partial; having once cast aside the cloak of immunity; he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing." (citations omitted).

\* \* \*

"The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf and not for those who do. There is a sound policy in requiring the accused who offers himself as a witness to do so without reservation, as does any other witness." *Id.* 271 U. S. at 496-497, 499.

While *Raffel* would seem to foreclose appellant's constitutional attack on the trial judge's comment, its present validity is a matter of considerable doubt in light of several subsequent decisions.

Twenty-seven years after its decision in *Raffel* the Court ruled in *Johnson v. United States,* 318 U. S. 189, 63 S. Ct. 549, 87 L. Ed. 704 (1943), under its supervisory powers over federal courts, that it was impermissible to allow comment on the exercise of the privilege against self-incrimination once the privilege was granted, even though the privilege was granted erroneously.[5] In so ruling the Court noted:

"[W]here the claim of privilege is asserted and unqualifiedly granted, the requirements of fair trial may preclude any comment. That certainly is true

---

5. Subsequent to *Johnson* the Court held in Griffin v. California, 380 U. S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965) that the 14th Amendment prevented the states from commenting on an accused's failure to testify.

where the claim of privilege could not properly be denied. The rule which obtains when the accused fails to take the stand (Wilson v. United States, 149 U.S. 60, 13 S. Ct. 765, 37 L. Ed. 650) is then applicable. As stated by the Supreme Court of Pennsylvania, 'If the privilege claimed by the witness be allowed, the matter is at an end. The claim of privilege and its allowance is properly no part of the evidence submitted to the jury, and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right. The allowance of the privilege would be a mockery of justice, if either party is to be affected injuriously by it.' " *Id.* 318 U. S. at 196-197, 63 S. Ct. at 553.

In *Grunewald v. United States,* 353 U. S. 391, 77 S. Ct. 963, 1 L.Ed.2d 931 (1957), the Court held that the assertion of the privilege before a grand jury was not inconsistent with later exculpatory testimony at the trial and, as a result, could not be used for impeachment. Four justices concurring in the decision reached the constitutional issue and stated:

"I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them. It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution. To the extent that approval of such a rule in *Raffel v. United States,* 271 U. S. 494, 46 S. Ct. 566, 70 L. Ed. 1054, has vitality after *Johnson v. United States,* 318 U.S. 189, 196-199, 63 S. Ct. 549, 553-554, 87 L. Ed. 704, I think the *Raffel* case should be explicitly overruled." *Id.* 353 U. S. at 425-426, 77 S. Ct. at 984-985.

The notion that it is impermissible to use the exercise of a constitutional right as a weapon against the accused has

also been utilized in other decisions of the Court thereby adding weight to the view that *Raffel* is no longer valid. *See Doyle v. Ohio,* 426 U. S. 610, 96 S. Ct. 2240, 49 L.Ed.2d 91 (1976); *Spevack v. Klein,* 385 U. S. 511, 87 S. Ct. 625, 17 L.Ed.2d 574 (1967); *Griffin v. California, supra* n. 5.

In *Doyle* the Court was faced with a situation where an accused's post arrest silence after the *Miranda* warnings had been given was used to impeach testimony given at the trial.[6] The Court utilizing reasoning analogous to that employed in *Johnson* concluded that it was fundamentally unfair to allow a prosecutor to impeach an accused with his silence under these circumstances.[7]

> "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale,* [422 U. S. 171] at 182-183, 95 S. Ct. [2133] at 2139, put it very well:
>
>> '[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time,

---

6. Prior to *Doyle* several decisions based on the exercise of the Supreme Court's supervisory powers had significantly diminished the impact of *Raffel* in the federal courts. *See* United States v. Hale, 422 U. S. 171, 95 S. Ct. 2133, 45 L.Ed.2d 99 (1975); Stewart v. United States, 366 U. S. 1, 81 S. Ct. 941, 6 L.Ed.2d 84 (1961); Grunewald v. United States, *supra.*

7. Although *Doyle* did not purport to decide whether a refusal to testify at a preliminary hearing could be used to impeach the testimony of an accused, 426 U. S. at 616 n. 6, 96 S. Ct. at 2244 n. 6, the reasoning employed by the Court sheds a great deal of light on the ultimate resolution of this issue.

as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony .... Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case.' " *Id.* 426 U. S. at 618-619, 96 S. Ct. at 2245.[8]

The reasoning employed in *Johnson, Grunewald*, and *Doyle* is fundamentally inconsistent with the notion contained in *Raffel* that an accused completely waives his privilege against self-incrimination by testifying and it makes no difference that an accused's prior silence might then be used as a weapon against him. Consequently, we conclude that *Raffel* has been impliedly overruled and that the privilege against self-incrimination prevents an accused's silence at a prior hearing from being considered in assessing his credibility.[9]

### III Admissibility of Psychologist's Opinion on Issue of Appellant's Criminal Responsibility

Dr. Dennis Harrison, a clinical psychologist, was not permitted to express an opinion on whether appellant was suffering from a mental disorder at the time of the crime or

---

8. Prior to the Supreme Court's decision in *Doyle* both the Court of Appeals and this Court had held that comment on an accused post arrest silence was impermissible. Younie v. State, 272 Md. 233, 238-245, 322 A. 2d 211, 214-217 (1974); Sutton v. State, 25 Md. App. 309, 317-320, 334 A. 2d 126, 130-132 (1975). *Cf.* Robeson v. State, 39 Md. App. 365, 386 A. 2d 795 (1978). (*Doyle* does not prohibit use of an accused's pre-arrest silence for impeachment).

9. Our conclusion in this regard is supported by other courts and commentators who have considered the continued validity of *Raffel. See* United States v. Anderson, 498 F. 2d 1038, 1044 n. 26 (D.C. Cir. 1974), *aff'd. sub nom* United States v. Hale, *supra* n. 6; Fowle v. United States, 410 F. 2d 48, 50 (9th Cir. 1969); State v. Carmody, 253 N.W.2d 415, 417-418 (N.D. 1977); Messier v. State, 428 P. 2d 338, 341-342 (Okla. Crim. 1967); Commonwealth v. Jones, 229 Pa. Super. 236, 327 A. 2d 638, 642-643 (1974); Dean v. Commonwealth, 209 Va. 666, 166 S.E.2d 228, 231 (1969); C. McCormick, Handbook of the Law of Evidence § 132 at 281 (2d. ed. E. Cleary 1972); Note, Impeaching a Defendant's Testimony by Proof of Post-Arrest Silence: Doyle v. Ohio, 25 Clev. St. L. Rev. 261, 294 (1976).

whether he was able to appreciate the criminality of his conduct. The trial judge's ruling was predicated on previous decisions of this Court in which we stated that an opinion on the ultimate issue of criminal responsibility can only be given by a medically trained psychiatrist. Appellant asks us to reconsider our position in light of a growing body of authority that is contrary to our prior decisions. We need not do so, however, in light of a recent amendment to *Md. Code,* Ct. & Jud. Proc. Art., § 9-120 which provides:

> "Notwithstanding the provisions of Article 59 or the provisions of any other law, a psychologist certified under the 'Psychologists' Certification Act' and qualified as an expert witness may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge, in any case in any court or in any administrative hearing." 1978 Md. Laws ch. 481.

The amendment was signed into law on May 16, 1978, and becomes effective July 1, 1978. Consequently, appellant's new trial will be governed by this provision and Dr. Harrison, if qualified, will be permitted to testify.

## IV Admissibility of the Perkins Report

The final point raised by appellant that merits noting concerns the admissibility of a report from Clifton T. Perkins State Hospital. The report was prepared in connection with a court ordered examination of appellant and expressed the view that appellant was criminally responsible for his actions at the time of the crime. In arguing against the admissibility of the report appellant mounts a two-pronged attack. First, he maintains the report was inadmissible because the State failed to show that one of the declarants in the report, Dr. Carmencita Mola, was qualified to express an opinion. Alternatively, appellant argues the report was inadmissible because Dr. Wilfried Freinek, the individual through whom the report was admitted, did not recall the factual basis of the opinions.

It is well settled that hospital records are admissible under the business record exception to the hearsay rule. *Dietz v. Moore,* 277 Md. 1, 6, 351 A. 2d 428, 432 (1976); *Pratt v. State,* 39 Md. App. 442, 387 A. 2d 779 (1978). One special problem presented by hospital records is whether the diagnostic opinions they contain are admissible because these opinions are rendered by experts who are not on the stand for cross-examination. We previously held in *Marlow v. Cerino,* 19 Md. App. 619, 636-637, 313 A. 2d 505, *cert. denied,* 271 Md. 739 (1974), that such opinions are admissible as long as it appeared that they were expressed by a qualified person. In arguing that the State must affirmatively establish the qualification of the declarant before the record can be admitted appellant overlooks *Marlow.* There we noted:

> "As in the case of expert opinions given on the witness stand, the qualifications of the declarant should appear, but it would seem that if it is proven or judicially noticed that the hospital from which the records come is a reputable institution of high standards this would justify the inference that what purport to be diagnoses made by physicians are made by doctors duly qualified to give such opinions." *Id.* 19 Md. App. at 635, 313 A. 2d at 514, quoting C. McCormick, *Handbook of the Law of Evidence* § 290 at 612 (1954).

In the instant case there was no evidence indicating Dr. Mola was unqualified and the trial judge could properly conclude that the opposite was true based on the status of Clifton T. Perkins as a reputable institution of high standards.

The second prong of appellant's argument is predicated on the notion that hospital records cannot be received into evidence where the witness through whom the report is introduced does not have sufficient information or expertise in the area in which an opinion is expressed to make cross-examination meaningful.[10] Contrary to appellant's

10. Although appellant's argument on this point was phrased in terms of a denial of his right to confront the experts who made the statements, he does not argue the admission of the report infringed upon his constitutional right of confrontation.

assertion once it was shown the report was made in the regular course of business and such reports were regularly made, the report was admissible and it was incumbent upon appellant to call the declarants as witnesses and examine them for weakness or error. *Marlow v. Cerino, supra,* 19 Md. App. at 637, 313 A. 2d at 515.[11]

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Prince George's*
> *County.*

---

11. We see no need to discuss the other issues raised by the appellant.