493 A.2d 1083

**In re COLIN R.**

**No. 1471, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

June 13, 1985.

Leonard L. Lucchi, Upper Marlboro (Benjamin R. Wolman and Wolman, Gushee & Newman, Upper Marlboro, on brief), for appellants.

Jamie B. Baer, Asst. County Atty. of LaPlata, Baltimore (Nancy B. Shuger, Asst. Atty. Gen., Baltimore, on brief), for appellee, Charles County Dept. of Social Services.

Seri Wilpone, Hughesville (Kathi Grasso, Hughesville, on brief), for appellee, Colin R. (child).

Argued before WILNER, BLOOM and KARWACKI, JJ.

KARWACKI, Judge.

Thomas R. and Donna R. appeal from orders of the Circuit Court for Charles County placing their son, Colin R., under the protective supervision of the Charles County Department of Social Services. These orders were entered in disposition of the court's earlier adjudication that Colin R. was a child in need of assistance, (hereafter "C.I.N.A."), as defined in Md.Code (1974, 1984 Repl.Vol.), § 3–801(e) of the Cts. & Jud.Proc. Art. They present the following questions in urging reversal of the lower court's determinations:

I. Did the court err in admitting certain evidence?

II. Was the lower court clearly erroneous in adjudicating Colin R. a C.I.N.A.?

III. Was the court appointed physician who testified at the disposition hearing improperly permitted to do so since he had not reduced his findings to a written report?

IV. Should the trial judge have recused himself on the appellants' motion?

The tragic scenario which gives rise to this appeal opens during 1982 when Colin R. was three years old. At that time he began to suffer episodes of vomiting, dehydration, high urinary output, and markedly low potassium levels. These episodes were cyclical in nature and required his repeated admission to the Southern Maryland Hospital Center where a preliminary diagnosis of his malady as Bartter's

Syndrome was made. That disease is characterized by chronic vomiting and dehydration, according to the expert testimony before the court, and is treated medicinally with Indocin with potassium supplements. When Colin failed to respond to this treatment he was referred to the Children's Hospital National Medical Center, (hereafter "Children's Hospital"), in Washington, D.C., in July of 1983. There he came under the care of Jose Salcedo, M.D. and Edward Ruley, M.D., specialists in pediatric nephrology.

Because Colin was not responding to treatment as a Bartter's Syndrome child, his treating physicians decided to perform a kidney biopsy to aid them in confirming or rejecting the diagnosis of Bartter's Syndrome. That biopsy disclosed abnormal calcium deposits which were inconsistent with impaired functioning of the kidneys to be expected of a Bartter's victim. The physicians then suspected abdominal epilepsy as the cause of Colin's episodic illness and performed an electroencephalogram in September of 1983. When that procedure revealed a slight abnormality in the occipital area of Colin's brain, Dr. Salcedo prescribed an anticonvulsive drug, Dilantin. This medication failed to control Colin's cyclical vomiting and dehydration.

On January 30, 1984, Colin was admitted to Children's Hospital during another episode of vomiting and dehydration. Because he had not responded to the accepted medical treatment for Bartter's Syndrome or abdominal epilepsy, his physicians decided to determine whether the previously discovered abnormal calcium deposits disclosed by the kidney biopsy could have been the result of some unprescribed drug being introduced into his system. Accordingly, urine samples were collected from Colin every twelve hours on January 30th and 31st and forwarded to a laboratory for analysis. This analysis disclosed the presence of diuretics in Colin's system. After receiving this report, the treating physicians, in order to double check the accuracy of the report, on February 7th and 10th again took urine samples from Colin and certain Children's Hospital staff volunteers

for a further analysis. These second tests confirmed the presence of diuretics in Colin's urine specimens.

Colin's physicians explained to the court that the diuretics found in Colin's system, Furosemide (sold under the brand name of Lasix) and Hydrochlorothiazide, act to block sodium in the kidneys causing high urinary output. This in turn causes dehydration, low potassium levels and vomiting. Colin's physicians further testified that diuretics, once administered, have a very short life within the body so that a dose of diuretic administered on any given day would not be evident in a urine sample taken the next day. To further confirm their diagnosis that diuretics were being injected into Colin's body, the treating physicians denied the appellants unsupervised access to Colin, and on February 10th discontinued all medication of Colin. Notably, Colin's urine sample of February 11th was free of any evidence of diuretics. Moreover, the symptoms from which he suffered since age three did not and have not reappeared since that date.

Because Colin had been in the custody of the appellants since birth and since the appellant, Donna R., was constantly at his bedside during earlier hospital admissions and during his admission to Children's Hospital on January 30, 1984, Dr. Salcedo confronted Donna R. with the results of the testing. Donna R., a licensed practical nurse employed at the Southern Maryland Hospital Center, disclaimed any knowledge of how the diuretics had been introduced into Colin's body.

Based upon these findings, Colin's physicians agreed upon an ultimate diagnosis of the illness he had suffered— Munchausen Syndrome by Proxy. This diagnosis describes an aberration where parents, for one warped reason or another, induce an illness in their child so that it appears to the medical community that the child is actually suffering from a disease.

Having made this diagnosis, the staff at Children's Hospital notified the Charles County Department of Social Servic-

es [1] of their conclusions and advised the Department that Colin would not be released to the appellants upon his discharge from the hospital. The Department then filed a petition with the court alleging that Colin was a C.I.N.A., and an investigator from the Charles County Sheriff's Department obtained a search warrant for the appellants' home. On February 16th, in executing that warrant, members of the Sheriff's Department seized hypodermic syringes and two vials of Lasix from the bedroom dresser drawer of Donna R.

After an emergency shelter care hearing on February 16, the court placed Colin in the temporary care and custody of the Department. An adjudicatory hearing on the C.I.N.A. petition held on March 19th and 20th resulted in the court's finding that Colin was a C.I.N.A. After disposition hearings on April 18th and 24th, the court permitted Colin to be returned to the custody of the appellants under the protective supervision of the Department. On August 7th a further disposition hearing was convened after which the court, on September 10, 1984, modified the terms of the protective supervision of Colin by the Department.

## I. *Admissibility of Evidence*

### A. *The urinalysis results*

After both Dr. Salcedo and Dr. Ruley had testified below to the hospital treatment of Colin during his January 30, 1984 admission to Children's Hospital, the appellee Department offered into evidence two memoranda contained within the properly authenticated hospital record of Children's Hospital. Dr. Ruley testified that such memoranda were made in the ordinary course of treating his patient, Colin R. The memoranda dated February 16 and March 8, 1984, on the letterhead of Children's Hospital, were addressed to Dr. Ruley by Roger L. Boecky, Ph.D., Director of Clinical Chemistry at Children's Hospital.

The February 16 memorandum stated:

---

1. Hereafter "the Department" or "appellee Department."

Three urine specimens from this patient were submitted to National Medical Services, Inc., Willow Grove, PA, for diuretic analysis.

January 31: Furosemide was detected at a concentration of 0.20 mg/dL.

Hydrochlorothiazide was detected at a concentration of 0.1 mg/dL.

February 7: Furosemide was detected at a concentration of 0.20 mg/dL.

No thiazide diuretics were detected.

February 10: Furosemide was detected at a concentration of 0.06 mg/dL.

No thiazide diuretics were detected.

In addition, a urine specimen collected from a volunteer who had ingested only furosemide was analyzed. Only furosemide was detected at a concentration of 0.2 mg/dL. A urine specimen collected from a volunteer who had ingested only indomethacin was analyzed. No diuretics were detected.

The March 8 memorandum advised:

On February 16, 1984 another urine specimen was collected from Colin. The specimen was tested for the presence of diuretics.

No thiazide diuretics were detected. No furosemide was detected.

 The appellants' objections to these memoranda were based on the hearsay rule since the technician who actually tested the urine samples was unavailable at trial for cross-examination. We believe the lower court properly admitted these portions of the hospital record under the broad statutory exception to the hearsay rule provided in Md.Code, *supra*, § 10–101 of the Cts. & Jud.Proc. Art. for hospital records. Where, as in the case *sub judice*, the portion of the record is pathologically germane to the patient's treatment at the hospital, *Marlow v. Cerino*, 19 Md.App. 619, 313 A.2d 505, *cert. denied*, 271 Md. 739 (1974), and it contains opinions of a person shown by the hospital

record to be qualified to express them, *Paige v. Manuzak,* 57 Md.App. 621, 471 A.2d 758, *cert. denied,* 300 Md. 154, 476 A.2d 722 (1984); *Raithel v. State,* 40 Md.App. 107, 388 A.2d 161 (1978), *aff'd,* 285 Md. 478, 404 A.2d 264 (1979), such opinion evidence is admissible under that statutory exception. The inherent trustworthiness of entries in a hospital record relevant to the life and death decisions being made by the treating physicians of a hospital patient have long justified this exception to the normal exclusion of hearsay. Moreover, the accuracy of findings of the laboratory analysis of the urine specimens which is the subject of Dr. Boechy's memoranda was completely corroborated by the course of treatment of Colin which followed in reliance upon those findings. There was simply no suggestion in the trial court that the laboratory findings were erroneous. Under these circumstances it was incumbent upon the appellants to produce the writer of the memoranda or the technician who performed the urinalysis, or their deposition testimony if not compellable witnesses in Maryland, to demonstrate any weakness or error in the hospital report of the urinalysis. *Raithel v. State, supra, Marlow v. Cerino, supra.*

Furthermore, the appellants' reliance on *Moon v. State,* 300 Md. 354, 478 A.2d 695 (1984) is misplaced. There the Court of Appeals held that it was error to admit a report of a blood test for intoxication in a prosecution for automobile manslaughter where the report's declarant was available at trial and the report was facially unreliable. The Court reasoned that the criminal defendant's right to confront his accusers, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article Twenty-One of the Maryland Declaration of Rights, was denied by application of the hearsay exception for such alcohol test results provided in Md.Code, *supra,* § 10–306 of the Cts. & Jud.Proc. Art. *See also Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978). The instant case is a juvenile C.I.N.A. proceeding, not a criminal prosecution, and the right of confrontation applicable in *Moon* is not avail-

able to the parents of an alleged C.I.N.A. *Jackson v. State,* 17 Md.App. 167, 300 A.2d 430, *cert. denied,* 268 Md. 749 (1973); *Woods v. Department of Social Services,* 11 Md. App. 10, 18, 272 A.2d 92, *cert. denied,* 261 Md. 730, *cert. denied,* 404 U.S. 965, 92 S.Ct. 340, 30 L.Ed.2d 285 (1971).

### B. *Oral Statement of Donna R.*

On February 16, 1984 investigators assigned to the Criminal Investigation Division of the Charles County Sheriff's Department applied for a warrant to search the home of the appellants and to seize evidence relevant to the illegal administration of diuretics to Colin R. District Court Judge Robert C. Nalley issued the warrant. In a search conducted the same day the officers discovered and seized two vials of the diuretic, Lasix, and hypodermic syringes from the bedroom dresser drawer of Donna R.

Joseph C. Montminy, Jr., one of the investigators, testified that when he confronted Donna R. with this evidence, she stated that she did not know anything about the diuretic and syringes that were found and denied any knowledge as to how those items happened to be in her dresser drawer. Officer Montminy further testified that Donna R. added, "If I am crazy I am glad you found out about it."

The appellants challenge the admission of this testimony, asserting that these statements made by Donna R. should have been excluded by the trial judge. They argue that the statements were made by her under circumstances violative of her rights guaranteed under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution as well as Articles Twenty-Two and Twenty-Six of the Maryland Declaration of Rights. The complete answer to this argument lies in the fact that no objection was lodged to this testimony when it was offered below and, therefore, it has not been preserved for our review. Md.Rule 1085.

### II. *The C.I.N.A. Adjudication*

Under our juvenile code, a C.I.N.A. is one who is not receiving ordinary and proper care and attention and whose

parents are unwilling or unable to give such care and attention to the child. Md.Code, *supra,* § 3–801(e) of the Cts. & Jud.Proc. Art. Allegations that a child meets that definition must be proven by a preponderance of the evidence. Md.Code, *supra,* § 3–819(d) and Md.Rule 914 e.3.

■ Initially, appellants challenge the standard under which allegations of C.I.N.A. are judged in this State. They argue that the Due Process Clause of the Fourteenth Amendment to the United States Constitution demands that such allegations be supported by the higher standard of clear and convincing evidence. The record reveals that no objection to this standard of proof was raised at the trial below and, therefore, the appellants have not preserved the question for our determination. Md.Rule 1085; *Hall v. State,* 22 Md.App. 240, 245, 323 A.2d 435 (1974); *Smith v. State,* 16 Md.App. 317, 324, 295 A.2d 802 (1972) *cert. denied,* 267 Md. 744 (1973). Moreover, the trial judge in rendering his oral opinion at the conclusion of the adjudicatory hearing stated:

[T]he Court is convinced beyond a reasonable doubt, beyond any doubt, by a preponderance of the evidence, that this child's mother has been administering to him this Furosemide causing the child to urinate in excess quantities, two, three quarts a day as opposed to what he would normally urinate, causing his potassium levels to go down, causing him to become dehydrated, and causing all of the symptoms that these doctors had indicated he was suffering from with Bartter's Syndrome.

Now, the Court is further convinced at this point by a preponderance of the evidence that Mr. R there has been no proof that he had any knowledge of the fact that this was done, that this was being done by his wife, but that he was unable at this point, although I do not feel he would be unwilling, but he was unable to back at the time that these doses of drugs were being administered, to stop his wife from doing it.

And that the Court needs to assist this child in order to protect him from his mother's acts, which she apparently is willing to take behind the back of her husband. So, I feel that this is, in fact, a child in need of the assistance of the Court. His mother wanting to administer these drugs, and the father being unable to prevent or stop her from doing that.

And, in fact, I find that Colin R. is a child in need of assistance.

■ Thus, the court actually applied a more demanding standard than that mandated by the statute and the rule.

Before leaving this question, however, we observe that the appellants' reliance on *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) as the basis for their attack on the preponderance test by which to judge allegations of a C.I.N.A. is inappropriate. In *Santosky* a five justice majority of the Supreme Court held that the employment of a fair preponderance of the evidence test for the determination of the issue of a child's permanent neglect justifying termination of parental rights under a New York statute was inconsistent with due process guaranteed by the Fourteenth Amendment. The Court mandated that the higher standard of clear and convincing evidence was required to comport with due process. In reaching its conclusion the Court reasoned that when permanently dealing with a fundamental liberty interest such as a parent's right to raise his or her child, the State must assume a greater burden of proof. The Court concluded:

The logical conclusion of this balancing process is that the "fair preponderance of the evidence" standard prescribed by Fam.Ct.Act § 622 violates the Due Process Clause of the Fourteenth Amendment. The Court noted in *Addington [v. Texas]*, 441 U.S. 418, 60 L.Ed.2d 323, 99 S.Ct. 1804 (1979)]: "The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." 441 U.S., at 427, 60

L.Ed.2d 323, 99 S.Ct. 1804. Thus, at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutionally intolerable.

*Id.* 455 U.S. at 768, 102 S.Ct. at 1402 (footnote omitted).

■ A proceeding instituted to terminate parental rights is a much more drastic and permanent interference with the parents' right to raise their child than is a C.I.N.A. proceeding aimed at protection of the child through temporary separation from his parents or the supervision of the parents in the raising of their child. The Legislature has recognized the distinction. In expressing one of the purposes of the juvenile code, it provided:

> To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety.

Md.Code, *supra,* § 3–802(a)(3) of the Cts. & Jud.Proc. Art.; *In re Jertrude O.,* 56 Md.App. 83, 97–98, 466 A.2d 885 (1983). On the other hand in authorizing proceedings to terminate parental rights as to a child, the Legislature has mandated that allegations justifying such termination be proven by clear and convincing evidence. Md.Code (1984), § 5–313 of the Family Law Article; *Washington County Department of Social Services v. Clark,* 296 Md. 190, 196, 461 A.2d 1077 (1983).

■ Lastly, our review of the record has convinced us that ample evidence was presented to justify the trial court's determination of Colin's status as a C.I.N.A. Considering the medical testimony, the hospital records of Colin's admissions from 1982 until 1984, the evidence that unprescribed diuretics and syringes were found in the appellants' home, and the complete absence of any answer by either of the appellants to the damning inferences arising from that evidence, we conclude that there is no basis for the suggestion that Judge Richard J. Clark was clearly erroneous in his resolution of the adjudicatory stage of this proceeding. Md.Rule 1086.

### III. *Absence of a Written Report From Court Appointed Physician Witness*

After the trial judge adjudicated Colin a C.I.N.A., he ordered the appellants and Colin to be evaluated by Kent Ravenscroft, M.D., a psychiatrist. At the disposition hearing on April 18, 1984, Dr. Ravenscroft was called as a witness by the appellee Department. He explained that, because of the bulk of the hospital records and other materials which he was required to review between the time of his appointment on March 27, 1984 and the hearing, he had not had time to prepare a written report. Appellants' counsel complained in his opening statement that he had not received a written report from Dr. Ravenscroft, but no objection was made to his testimony when offered. At the conclusion of Dr. Ravenscroft's testimony, the appellants requested a continuance of the disposition hearing so that they might present evidence rebutting Dr. Ravenscroft's testimony, and their request was granted.

Under these circumstances the appellants' contention that the absence of a written report from Dr. Ravenscroft prejudiced their defense is not preserved for our review. Nevertheless, we observe that Md.Code, *supra*, § 3-818(c) of the Cts. & Jud.Proc. Art.[2] and Md.Rule 905 a[3], which regulate physical and mental examinations

---

**2.** (c) The report of the study is admissible as evidence at a waiver hearing and at a disposition hearing, but not at an adjudicatory hearing. However, the attorney for each party has the right to inspect the report prior to its presentation to the court, to challenge or impeach its findings and to present appropriate evidence with respect to it.

**3.** 1. Order for Examination.
Any order for a physical or mental examination pursuant to section 3-818 of the Courts Article shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made. The court shall order that the examination be conducted on an outpatient basis if, considering the child's condition, that is feasible and appropriate. The order may regulate the filing of a report of findings and conclusions and the testimony at a hearing by the examining physician, psychiatrist, psychologist or other profes-

and studies ordered by the juvenile causes judge, were not violated by the absence of a report. Those provisions create a hearsay exception for the admission of evaluative reports at disposition hearings in C.I.N.A. cases and require as a condition to that exception that the parties to the case be furnished a copy of the report in advance of the hearings. Likewise, where the evaluator appears in court, the parties are entitled to copies of any reports furnished to the court. The statute and the rule have no application where no report is prepared by the evaluator, unless it can be shown that the evaluator deliberately failed to reduce his findings and conclusions to written form in order to avoid the discovery of his testimony in advance of trial. There was no such showing in the instant case.

## IV. *The Recusal Issue*

On March 20, 1984, after the trial judge delivered his oral opinion that Colin was a C.I.N.A., a discussion took place in open court concerning the evaluations which should be ordered in preparation for the disposition hearing and as to Colin's care and custody pending that hearing. Colin at that time was in a foster care placement under the care and custody of the appellee Department.

The court was advised that Donna R. had left Charles County and was staying with her family in North Carolina. Furthermore, appellants' counsel represented that Donna R. had no plans of returning to Charles County.

The court decided to continue the foster care of Colin until disposition but agreed with counsel and representatives of the appellee Department that a more liberal visita-

---

sionally qualified person, the payment of the expenses of the examination any other relevant matters.

2. Service of Copies of Report.

Copies of all studies and reports of examinations made to the court under this Rule shall be furnished by the court to counsel for the parties when received by the court, but not later than two days before any hearing at which the results of the examinations will be offered in evidence.

tion schedule with Colin should be arranged for his father, Thomas R., and Colin's brothers and sister. The court's acquiescence in this more liberal visitation was clearly based on the assumption that Donna R. would have no contact whatsoever with Colin.

On Thursday, March 29, 1984, the attorney for the appellee Department, Jamie B. Baer, learned in a conversation with appellants' attorney, Benjamin R. Wolman, that Donna R. intended to return to Charles County the following weekend. In the same conversation, Ms. Baer advised Mr. Wolman that Donna R. had been forwarding foodstuffs to Colin at his foster home, and she asked appellants' counsel to see that such practice was discontinued.

Ms. Baer then reported to the trial judge what she had learned concerning these potential contacts between Donna R. and Colin. As a result of that conversation, on March 30, 1984, Ms. Baer addressed a letter to the acting director of the appellee Department advising that Judge Clark had insisted that "under no circumstances is [Colin] to be removed from the foster home by any of his family members while [Donna R.] is in this area." Copies of this letter were mailed to Judge Clark and opposing counsel.

Based upon the communication between Ms. Baer and Judge Clark referred to in that letter, appellants' counsel filed a motion to recuse Judge Clark from all further proceedings in the case. Judge Clark declined to do so and in his order denying the motion stated:

> This Court finds that any such communication was solely for the purpose of clarifying remarks from the Bench regarding visitation which were being interpreted differently by counsel. Further, this Court is of the opinion that it can fairly and impartially decide this case.

█ Assuming that the *ex parte* communication by Ms. Baer with Judge Clark was improper as violative of Maryland Rule 1231, Paragraph XVI, we find no abuse of discretion by the trial judge in refusing to recuse himself under the circumstances of the communication. Ms. Baer was

very aware that Judge Clark's decision on March 20, 1984 to permit liberal visitation privileges with Colin by his father and other members of his family was based in large measure on the assurance that Judge Clark had received that Donna R. would be in no position to come into contact with Colin. Ms. Baer rightfully was alarmed when she learned on March 29, 1984, that Donna R. was returning to Charles County within the next few days. She also was properly concerned about Donna R. supplying foodstuffs to Colin. This knowledge required immediate communication with the trial judge, who just nine days earlier had been thoroughly convinced that Donna R. had engaged in conduct over a two year period aimed at threatening the permanent health and even the life of Colin by the improper administration of drugs to him. The trial judge's reaction to receipt of this information prevented possible harmful contact between Donna R. and Colin.

The decision of whether to recuse is a matter within the sound discretion of the court, and will not be disturbed on appeal except for abuse of discretion. *Harper v. Harper,* 49 Md.App. 339, 342, 431 A.2d 761 (1981), *reversed in part on other grounds,* 294 Md. 54, 448 A.2d 916 (1982). Furthermore, nothing in the record below demonstrates any hostile feeling against the appellants by the trial judge which prevented a fair trial. *Tidler v. Tidler,* 50 Md.App. 1, 11, 435 A.2d 489 (1981); *Carey v. State,* 43 Md.App. 246, 251, 405 A.2d 293 (1979), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1660, 64 L.Ed.2d 244 (1980). Finally, after the disposition hearings conducted by Judge Clark on April 18th and 24th, the appellants were permitted to resume custody of Colin under protective supervision by the appellee Department. This was the disposition recommended by Dr. Ravenscroft and urged upon the lower court by the appellants.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANTS.